IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 115,426

STATE OF KANSAS,
*Appellee*,

v.

MARCUS THIASEN GUEIN JR.,
*Appellant*.

SYLLABUS BY THE COURT

1.

The Fourth and Fifth Amendments to the United States Constitution provide occasionally overlapping, but nevertheless distinct, protections. Under the Fourth Amendment, a person is protected from unreasonable searches and seizures. But under the Fifth Amendment a person's privilege against self-incriminating statements is the privilege being protected.

2.

Under the Fifth Amendment, statements stemming from custodial interrogation must be excluded unless the State demonstrates it used procedural safeguards, i.e., *Miranda* warnings, to secure the privilege against self-incrimination.

3.

When a defendant claims his or her statements to police were not voluntary, the State bears the burden to prove the voluntariness by a preponderance of the evidence. A case-by-case evaluation is employed to determine whether police coercion was impermissibly used in obtaining a statement. To determine whether the statement was the product of the defendant's free and independent will, an appellate court examines the

1

totality of the circumstances surrounding the statement and determines its voluntariness by considering a list of nonexclusive factors.

4.

A confession will not be received into evidence unless it has been freely and voluntarily made. If the confession has been extorted by fear, it will be excluded as involuntary.

Review of the judgment of the Court of Appeals in 53 Kan. App. 2d 394, 388 P.3d 194 (2017). Appeal from Johnson District Court; TIMOTHY P. MCCARTHY, judge. Decision filed June 28, 2019. Judgment of the Court of Appeals affirming in part and reversing in part the district court is affirmed in part and reversed in part. Judgment of the district court is reversed and the case is remanded for further proceedings.

*Thomas J. Bath*, of Bath & Edmonds, P.A., of Overland Park, argued the cause, and *Mitch E. Biebighauser*, of the same firm, was on the brief for appellant.

*Shawn E. Minihan*, assistant district attorney, argued the cause, and *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The decision of the court was delivered by

NUSS, C.J.: Marcus Guein, Jr., was convicted by a jury of felony distribution of marijuana and misdemeanor possession of paraphernalia. A majority of the Court of Appeals panel reversed in part and affirmed in part the district court's decision on Guein's motion to suppress evidence and remanded to that court. *State v. Guein*, 53 Kan. App. 2d 394, 388 P.3d 194 (2017). Guein and the State now seek our review of different issues in that majority decision.

2

The issues on appeal, and this court's accompanying holdings, are:

1.      Was the pre-*Miranda* statement Guein made surrounding the initial pat-down of him admissible in evidence? No.

2.      Was the post-*Miranda* statement Guein made given voluntarily and therefore admissible in evidence? No.

As a result, we affirm the panel majority's decision in part and reverse in part and remand for further proceedings in accordance with this decision.

FACTS AND PROCEDURAL HISTORY

At around 1:30 a.m., Lenexa police officers Curtis Weber and Megan Larson were driving through an area they knew had a high rate of drug crimes. Weber saw two parked cars in the lot of a Burger King the officers thought to be closed. He also saw a man, later identified as Guein, move from the driver's seat of one car to the passenger seat of the other. Because Weber immediately suspected a drug deal, he pulled into the lot so his patrol car was not blocking the car. He turned off his headlights and activated no emergency lights or sirens.

Weber and Larson got out, with Weber approaching the driver's side of the car (occupied by a man later identified as Jordan Gresham) and Larson approaching the passenger's. Through its open window, Weber detected the "very strong" odor of what he described as "fresh" marijuana. It is unclear whether he smelled marijuana that was raw, recently smoked, or something else. Weber told Gresham to "Come back here and talk to me, okay?" When Gresham asked, "Me? What for?" Weber responded, "Yes, you, because your car smells like marijuana." When Gresham apparently did not respond

3

quickly enough to satisfy Weber, Weber dropped the request and directed Gresham to, "Come back here and talk to me." According to Guein's later testimony at the suppression hearing, at this point he felt he and Gresham were being accused of committing a crime.

Weber then told Larson to watch the passenger (Guein) and again directed Gresham to, "Come back here and talk to me." Gresham complied. Weber later testified that he made this statement because he was going to search the car. Weber further testified, "I also believed they could be in possession of narcotics."

Weber gave Gresham both a pat-down search and one in which he removed the contents of Gresham's pockets and placed them on the car. Finding nothing, Weber then ordered Gresham to go sit on the curb, directing that he not take the removed items with him.

Weber then approached the passenger side while Larson ordered Guein out of the car. At that point, Guein and Weber were face-to-face. Weber asked Guein if he had any weapons. When Guein replied, "No," Weber asked to pat him down, just "[t]o be sure." Guein agreed. Weber testified Guein would have been moved so Guein faced away from him and he would have instructed Guein to put his hands on his head.

While Guein was in this submissive position, Weber also asked to search Guein's pockets. After Guein agreed, Weber removed everything from them. As Weber had done with Gresham, he placed the contents on Gresham's car. Guein later testified that when Weber took his possessions, "I took it that I was gonna be here for a while."

About the time Weber searched Guein's pockets and removed their contents, Weber said, "Dude, you reek of weed." Guein replied, "Yeah." Weber then asked, "How

4

much weed you got?" On the body cam video Guein can clearly be heard to respond, "I have none."

Weber did not accept this answer but instead asked, "You have none?" Guein then confessed to having a "little bag" on him. When asked at the suppression hearing why he changed his answer, Guein testified his "pockets were empty and [he] was still in a state where [he] wasn't free to go." He believed Weber was going to search him anyway, and he did not feel he had the option of not answering his questions. Guein also testified that during the encounter he feared for his physical safety.

Weber asked Guein to retrieve the bag of marijuana. After Guein complied, he handed it to Weber who handcuffed him behind his back. Weber then walked the handcuffed Guein to the back of the patrol car. En route, a discussion occurred that is at the heart of the second issue on appeal, i.e., the voluntariness of Guein's post-*Miranda* statement:

> Weber: "Right now is the time to be honest with me, man, okay? Don't fuck around with me and I ain't gonna fuck around with you, okay? You hear me?"

> Guein: "I'm not going to fuck around with you."

> Weber: "Listen, man. I'm telling you right now I know what you're doing out here. I'm going to ask you some questions here in a little bit."

> Guein: "Yes, sir."

> Weber: "Don't fuck with me, okay?"

> Guein: "I understand, sir."

5

Weber: "You hear me? You don't screw around with me. I ain't gonna screw around with you. I'm gonna do what I can to help you out, okay?"

Guein: "Yes, sir."

Weber: "I'm telling you right now, I know what's going on, all right? Have a seat."

When Weber put the handcuffed Guein into the back of the patrol car, he asked whether there was any additional marijuana in either of the two cars. Guein responded that marijuana was in his car. Leaving Guein in the back of the patrol car, Weber approached Guein's car. Inside he saw a handgun and loose marijuana in plain view. Weber called in the serial number on the handgun—which it turned out Guein legally owned—and for a K-9 unit.

Weber then approached Gresham seated on the curb and gave essentially the same warning he had given Guein:

"I'm going to tell you just like I told your buddy. We know what's going on here, okay? We're not going to ask you questions right now. We're going to ask you questions here in a minute, alright? I'm gonna tell you—don't fuck around with me, okay? You don't screw with me, I ain't gonna screw with you. You understand? Alright. And I'll tell you I know what's happening right now, alright? Have a seat."

Weber directed Gresham to the back seat of another patrol car that had arrived. He returned to Guein who by this time had been waiting about 10 minutes in the back of Weber's patrol car. Weber rapidly read Guein his *Miranda* rights, telling him "I've gotta do it because you're in handcuffs."

Weber: "All right, man, I'm going to read you your rights. You ever been arrested?"

Guein: "No."

Weber: "Never? You never been put in handcuffs?"

Guein: "No."

Weber: "Okay. I'm gonna read you your rights. You've seen or heard it on TV; *I've gotta do it because you're in handcuffs, okay?* You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and to have him present while you're being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish. You can decide at any time to exercise these rights, not answer any questions, or make any statements. Do you understand each of those rights that I've explained to you—there were five of them?"

Guein: "Yes, sir."

Weber: "And with those rights in mind, do you want to talk to me?"

Guein: "Yeah, man." (Emphasis added.)

Guein admitted he had purchased the marijuana for $25 and was there to sell it to Gresham for $50. Guein told Weber that he had never been arrested or put in handcuffs before and that he was nervous. Weber asked Guein about becoming a confidential informant. But Guein, a Missouri resident, had no contacts on the Kansas side of the state line that would be helpful. Guein lamented his lack of information that would help Weber. He repeated several times that he wished he did.

7

After this discussion with Guein, Weber returned to Guein's car to actually conduct a search. Inside, he found a glass jar of marijuana in a backpack on the front seat. He also found rolling papers, a marijuana pipe, a wood grinder, and a box of plastic baggies.

The State charged Guein with distribution of marijuana, felony possession of paraphernalia, and misdemeanor possession of paraphernalia. Guein filed a motion to suppress his statements and the evidence obtained as a result of the search of his person and his car.

At the suppression hearing, Guein argued: (1) his pre-*Miranda* statement that he had marijuana on his person and in his car should be suppressed because Weber interrogated him while he was in custody without first informing him of his *Miranda* rights; (2) his post-*Miranda* statements that he was there to sell marijuana should be suppressed because Weber had threatened him by saying, "Don't fuck around with me and I ain't gonna fuck around with you"; and (3) the physical evidence—the bag of marijuana and the items found in his car—should be excluded from evidence because they were discovered by violating his constitutional rights when Weber was questioning him.

The district court found that the police had the right to investigate the two cars parked late at night in a high-crime neighborhood as well as to further investigate after smelling the odor of marijuana coming from one of the cars. Because the court ruled Guein was not in custody until Weber handcuffed him, it found admissible his statement that he had marijuana in his underwear. But the court suppressed Guein's statement—made between the time he was handcuffed and before he was provided a *Miranda* warning—that he had marijuana in his car. By contrast, the court ruled the post-*Miranda* statements were admissible because at that point Guein had voluntarily waived his rights.

8

Finally, the court denied suppression of the physical evidence because Guein's pre-*Miranda* statement about the marijuana in his underwear was admissible and the doctrines of plain view and inevitable discovery applied to the evidence in his car.

A jury later found Guein guilty of felony distribution and misdemeanor possession of paraphernalia but acquitted him of felony possession of paraphernalia.

On Guein's appeal, he reasserted that his initial statement about having marijuana on his person should be suppressed because Weber interrogated him while he was in custody without first informing him of his *Miranda* rights. Guein also argued that this marijuana itself should be suppressed because Weber lacked legal authority to search him for it. He additionally argued the statements he made after being *Mirandized* that he was there to sell marijuana should be suppressed because Weber's warning not to "fuck with" him constituted threats and promises that had a coercive effect, making those later statements involuntary. *State v. Guein*, 53 Kan. App. 2d 394.

The entire Court of Appeals panel held that the district court properly admitted Guein's statement about the marijuana in his underwear and the marijuana itself found there. But only a majority ruled the lower court erred in denying the motion to suppress Guein's post-*Miranda* statement that he was there to sell Gresham marijuana. The majority concluded Weber's statements to Guein were sufficiently threatening to negate the *Miranda* warning. But it could not conduct a harmless error analysis to determine the significance of Guein's statements in convicting him on the distribution charge because the State did not include a trial transcript in the record on appeal. So the majority set aside the convictions and ordered a new trial.

Judge Gardner dissented, writing that she would have affirmed the district court's denial of Guein's motion to suppress his post-*Miranda* statements.

9

We granted the State's petition for review and Guein's cross-petition. Guein did not seek review of the panel's ruling that the State had probable cause to search his person based on the smell of marijuana and his admission that he had marijuana in his underwear. So that issue is not before us. *Snider v. American Family Mut. Ins., Co.*, 297 Kan. 157, 172, 298 P.3d 1120 (2013) (challenge to Court of Appeals holding not before Supreme Court on review when issue not raised in petition or cross-petition). Our jurisdiction is under K.S.A 20-3018(b) (petition for review) and K.S.A. 60-2101(b) (review of Court of Appeals decision).

Additional facts will be provided as necessary to our analysis.

ANALYSIS

Both of the evidence suppression issues on appeal have the same standard of review.

*Standard of review*

When an appellate court reviews a district court's decision on a motion to suppress, it first reviews the district court's factual findings to determine whether they are supported by substantial competent evidence. *State v. Dern*, 303 Kan. 384, 392, 362 P.3d 566 (2015). Substantial evidence means legal and relevant evidence that a reasonable person would find adequate to support a conclusion. *State v. May*, 293 Kan. 858, 862, 269 P.3d 1260 (2012).

The district court's ultimate legal conclusions are reviewed de novo, and the appellate court does not reweigh evidence, assess the credibility of witnesses, or resolve conflicts in the evidence. *Dern*, 303 Kan. at 392. When the significant

10

facts are not in dispute, whether to grant or deny a suppression motion presents a question of law over which the appellate court has unlimited review. *State v. Stevenson*, 299 Kan. 53, 57, 321 P.3d 754 (2014). The State bears the burden of proving the challenged statements and physical evidence are admissible. K.S.A. 22-3215(4); K.S.A. 22-3216(2).

Issue 1: *Was the pre-*Miranda *statement Guein made surrounding the initial pat-down of him admissible as evidence?*

Guein argues his statements made surrounding his pat-down, e.g., that he had marijuana on his person, should be suppressed. He specifically asserts he was being interrogated in custody and Weber fatally failed to read him the warnings required in such situations by *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). See *State v. Hebert*, 277 Kan. 61, 68, 82 P.3d 470 (2004).

Guein argues the "investigatory detention" analysis adopted by Kansas appellate courts has been stretched beyond its proper limits. But he does not make the standard argument that the detention violated the Fourth Amendment. Rather, he bases his argument on a violation of the Fifth Amendment privilege against self-incrimination. *Hebert*, 277 Kan. at 68. As a result, his position rises and falls on whether he was in custody—to trigger the *Miranda* warnings—when he made this incriminating statement surrounding the initial pat-down. *Guein*, 53 Kan. App. 2d at 404 ("the only dispute in our case is whether [Guein] was 'in custody' for *Miranda* purposes").

We begin our analysis with an important observation: the Fourth and Fifth Amendments provide occasionally overlapping, but nevertheless distinct, protections. See, e.g., *United States v. Kim*, 292 F.3d 969, 975 (9th Cir. 2002) ("[W]hether an individual . . . has been unreasonably seized for Fourth Amendment purposes and whether that individual is 'in custody' for *Miranda* purposes are two different issues.");

11

see also *In re I.J.*, 906 A.2d 249, 257 (D.C. 2006) ("[T]he Fourth Amendment inquiry is not the same as, nor does it ultimately decide, the question of whether there was custody under the Fifth Amendment."); accord *United States v. Acosta*, 363 F.3d 1141, 1148-50 (11th Cir. 2004). In short, under the Fourth Amendment, a person is protected from unreasonable searches and seizures. But the Fifth Amendment protects a person's privilege against self-incriminating statements.

For purposes of a Fourth Amendment analysis, encounters between law enforcement officers and the public are generally classified under one of these categories: (1) consensual encounters; (2) investigatory detentions, also known as *Terry* stops; (3) public safety stops; and (4) arrests. *State v. Martinez*, 296 Kan. 482, 485, 293 P.3d 718 (2013). Relevant to this case, an investigatory detention or *Terry* stop allows an officer to detain any person in a public place if the officer reasonably suspects that the person is committing, has committed, or is about to commit a crime. K.S.A. 22-2402(1); see *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Although a person is seized when stopped by an officer and the freedom to walk away is restrained, a person can be seized without actually being under arrest. When a person is temporarily seized under *Terry*—but not under arrest—that encounter is an investigatory detention. *State v. Hill*, 281 Kan. 136, 142, 130 P.3d 1 (2006).

By contrast, under the Fifth Amendment, statements stemming from custodial interrogation must be excluded unless the State shows it used procedural safeguards, i.e., *Miranda* warnings, to secure the defendant's privilege against self-incrimination. *State v. Schultz*, 289 Kan. 334, 340-41, 212 P.3d 150 (2009). As we said in *State v. Lewis*, 299 Kan. 828, 834-35, 326 P.3d 387 (2014):

> "The *Miranda* safeguards are triggered only when an accused is (1) in custody
> and (2) subject to interrogation. A custodial interrogation is defined as questioning

initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his or her freedom in any significant way. A custodial interrogation is distinguished from an investigatory interrogation, which occurs as a routine part of the fact-finding process before the investigation reaches the accusatory stage. *State v. Warrior*, 294 Kan. 484, 496, 277 P.3d 1111 (2012); see *State v. Bridges*, 297 Kan. 989, 1002, 306 P.3d 244 (2013)."

At the heart of the custody analysis, the court must ultimately determine as a matter of law whether, under the totality of the circumstances, a reasonable person would have felt free to terminate the interrogation and disengage from the encounter. *State v. Bridges*, 297 Kan. 989, 1009, 306 P.3d 244 (2013) (citing *State v. Warrior*, 294 Kan. 484, 497, 277 P.3d 1111 [2012]); see *Thompson v. Keohane*, 516 U.S. 99,113-14, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995) ("[I]f encountered by a 'reasonable person,' would the identified circumstances add up to custody as defined by *Miranda*?").

Nonexclusive factors to consider in making this determination—if an interrogation is custodial or investigative—include:  (1) the interrogation's time and place; (2) its duration; (3) the number of law enforcement officers present; (4) the conduct of the officer and the person questioned; (5) the presence or absence of actual physical restraint or its functional equivalent, such as drawn firearms or a stationed guard; (6) whether the person is being questioned as a suspect or a witness; (7) whether the person questioned was escorted by officers to the interrogation location or arrived under his or her own power; and (8) the interrogation's result, e.g., whether the person was allowed to leave, was detained further, or was arrested after the interrogation. No single factor outweighs another, nor do the factors bear equal weight. Every situation must be analyzed on its own particular facts. See *Lewis*, 299 Kan. at 835; *Bridges*, 297 Kan. at 1008.

13

The full panel considered these eight factors in its Fifth Amendment analysis. It also acknowledged that whether a person is in custody for *Miranda* purposes can be a complex question because there are some situations in which a person may not truly be free to leave but still has not been "'subjected to restraints comparable to those associated with a formal arrest,'" so *Miranda* warnings need not be given. *Guein*, 53 Kan. App. 2d at 405 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 441, 104 S. Ct. 3138, 82 L. Ed. 2d 317 [1984]). It concluded Guein did not make incriminating statements surrounding the initial pat-down, like having marijuana on his person, that would equate to a confession during a custodial interrogation. So *Miranda* warnings were not necessary.

Like the panel, we too apply the eight factors listed in *Lewis* to our facts. But we disagree with the panel's ultimate legal conclusion because nearly all the factors favor Guein. Specifically, we conclude the circumstances establish that the encounter was custodial, i.e., a reasonable person would not have felt free to terminate the interrogation and disengage from the encounter. *Bridges*, 297 Kan. at 1009; *Warrior*, 294 Kan. at 497.

In our custody analysis, we logically start with the *Lewis* factor concerning time and place of the encounter. Weber testified he saw no other cars in the area at 1:30 a.m. and the officers believed the Burger King was closed. See *State v. Williams*, 297 Kan. 370, 380, 300 P.3d 1072 (2013) (holding under Fourth Amendment analysis that circumstance of law enforcement encounter occurring at 2:30 a.m. on a deserted sidewalk would contribute to a belief that defendant was not free to leave). From the viewpoint of a reasonable person in Guein's position, the early morning hour, the darkness, and nearly deserted area would be considerations weighing toward custody.

As to the second factor, a consideration in our previous decisions has been whether officers *immediately* exert their authority or ask questions without advising the person he or she is free to leave or to decline answering them. See *Williams*, 297 Kan. at

14

380 ("[T]he officers immediately began asking Williams questions without indicating he was free to leave."); *State v. Epperson*, 237 Kan. 707, 713-14, 703 P.2d 761 (1985) (concluding under a Fourth Amendment analysis that officer unlawfully detained defendant when officer called out to him to wait as he walked away from his car, he stopped walking in response, and officer immediately began asking general questions about his reasons for being in the area); see also *State v. Soto*, 143 N.M. 631, 179 P.3d 1239 (2008) (discussed in *Williams* and holding a reasonable person riding a bicycle at 2:30 a.m. would not feel free to leave when officers pulled alongside and immediately began questioning the person about his activities).

Here, Weber immediately asked Gresham to "Come back here and talk to me, okay?" When Gresham asked why, Weber responded by telling Gresham—with Guein alongside—it was because the car they sat in smelled of marijuana. After Gresham apparently hesitated to comply, Weber changed from simply requesting to twice commanding Gresham to "come back here and talk to me." And Gresham complied. At no time was Gresham advised he did not have to comply with the commands or answer questions. Contrast *Bridges*, 297 Kan. at 1009 (officers told defendant he did not have to let them into his room to talk, he did not have to discuss anything with them, and they would leave if he so desired). Here, the absence of these police advisories (though concededly not required), and the immediate show of authority sustained over an admittedly short (but intense) time frame, point toward a reasonable person not feeling free to end the questioning or to leave. And the seated Guein certainly had the ability to watch and hear this interaction while he was being guarded by Larson at Weber's direction. Indeed, Guein testified that at this stage he already felt Weber was accusing him and Gresham of committing a crime. And Weber's own testimony confirmed he (1) believed at that point that Guein and Gresham "could be in possession of narcotics," and (2) was going to search the car.

15

Third, while only two officers were present, they approached Gresham's car on opposite sides, putting Gresham and Guein between them. And as Weber searched each man, Larson guarded the other—first Guein while seated in the car and later Gresham seated on the curb. See *United States v. Dudley*, 854 F. Supp. 570, 579 (S.D. Ind. 1994) (noting that circumstance of one occupant of vehicle being ordered to sit on the ground while officers watched over her, "tilt[ed] the scales and present[ed] a 'show of authority' by police officers"); cf. *Schultz*, 289 Kan. at 341-42 (authorities telling defendant not to move from his kitchen table and keeping him under constant observation was a factor weighing in favor of custody). So while only two officers were involved, their one-to-one ratio to the car's occupants allowed a show of authority specific to each.

This circumstance carries over to the fourth factor—the conduct of the officer and the person questioned. In addition to the conduct we previously described when discussing the other factors, Guein specifically could see and hear even more concerning Gresham's interaction with Weber: Weber patting down Gresham, then emptying Gresham's pockets and placing their contents on the car. Guein could also witness Weber ordering Gresham to sit on the curb after the pat-down and search and telling him to leave his pocket contents there. See *Lewis*, 299 Kan. at 837 (defendant surrendering his car keys, cell phone, and wallet before the questioning was a circumstance weighing in favor of custody); *State v. Thompson*, 284 Kan. 763, 801, 166 P.3d 1015 (2007) (discussing factors in a Fourth Amendment context and noting that "typically a driver would not feel free to leave if his or her driver's license has not been returned"). With this scene unfolding before Guein, a reasonable person in his position would have understood he too was subject to the officers' authority and his freedom was restrained—especially because he knew Larson was watching him (at Weber's direction).

As for law enforcement actions soon directed toward Guein personally, Larson ordered—not asked—Guein to get out of the car. Weber then had Guein turn around and

16

place his hands on his head. After Guein's compliance, Weber proceeded as Guein had witnessed with Gresham: a pat-down, a search of Guein's pockets, removal of their contents, and placement on the car. During this time, Weber also told Guein his body "reeked of weed." He asked how much weed Guein possessed and openly challenged Guein's denial. And as with Gresham, Guein too never was given police advisories that he did not have to answer questions or comply with the commands. Perhaps because of Gresham's behavior as his example, he decided to comply—and answer. Given the officers' conduct, and Guein's reaction, a reasonable person would not have felt free to end the interrogation or to leave. See *Lewis*, 299 Kan. at 837; *Schultz*, 289 Kan. at 341-42; *Thompson*, 284 Kan. at 801.

This conduct also relates to the fifth factor—the presence or absence of physical restraint or its functional equivalent, such as drawn firearms or a stationed guard. Neither officer drew a firearm. But as mentioned, Weber directed Larson to stand guard over the seated Guein while he searched Gresham—and later to stand guard over the seated Gresham while he searched Guein. Additionally, when the interrogation started, Guein was still standing in the submissive position of his hands on his head. Weber stood right behind him—searching. This factor weighs toward custody. See *State v. Schultz*, 289 Kan. at 341-42 (through verbal instruction and physical positioning, officers prevented defendant from leaving their presence).

As to the sixth factor, because Weber detected the "very strong" smell of marijuana in the car where Guein was seated and the "reek of weed" on Guein's person after he got out, Weber clearly focused on Guein as a suspect—not a witness. And Weber questioned Guein (and searched him) because he believed Guein "could be in possession of narcotics." See *Lewis*, 299 Kan. at 837 (circumstance weighing in favor of custody was defendant being questioned not just as witness but as person of interest in the crimes).

17

The seventh factor relates to whether officers escorted the person to the interrogation location or arrived under his or her own power. Certainly, Guein drove himself to the scene. But Larson watched over him in the car, ordered him out of it, and after Guein complied, Weber had him turn around and put his hands on his head. Focusing on those movements from his seated position in the car to the spot of the interrogation, the officers directed Guein's movement through a show of authority. See *State v. Regelman*, 309 Kan. 52, 55, 60, 430 P.3d 946 (2018) (officers ordering defendant to stop walking away and "either sit on the steps or sit in my patrol car" subjected him "to the functional equivalent of physical restraint since he had been denied freedom of movement and was ordered to return to his porch [steps]").

Finally, the eighth factor relates to the interrogation's result—whether officers allowed the person to leave, detained the individual further, or arrested the individual after the interrogation. Here, it took Weber mere seconds to arrest Guein and handcuff him because Weber already was standing over and behind Guein during the search and interrogation. See *Lewis*, 299 Kan. at 837 (after interview, defendant was questioned further, detained, and arrested—a circumstance weighing in favor of custody).

We acknowledge Guein's subjective beliefs are not part of the legal analysis to determine if the interrogation is custodial or investigative. But we observe, among other things, he testified he changed from denying—to admitting—to Weber that he had marijuana because his "pockets were empty and [he] was still in a state where [he] wasn't free to go." He further testified he believed Weber was going to search him anyway, and he did not feel he had the option of not answering his questions. He also testified that during the encounter he feared for his physical safety.

More to the dispositive analytic point, however, after our de novo review we conclude a reasonable person in Guein's position would have held the same beliefs—that

18

he or she was not free to terminate the interrogation and disengage from the encounter. See *Bridges*, 297 Kan. at 1009 (citing *Warrior*, 294 Kan. at 497). In short, we conclude nearly every factor listed in *Lewis* leads to the conclusion that the interrogation was custodial. We specifically disagree with any panel suggestion that Guein was not "'subjected to restraints comparable to those associated with a formal arrest.'" 53 Kan. App. 2d at 404-05 (quoting *Berkemer*, 468 U.S. at 441). So Weber should have given Guein *Miranda* warnings before questioning him.

As a result, we reverse the district court's denial of Guein's motion to suppress this particular pre-*Miranda* statement. See *State v. Schultz*, 289 Kan. at 340-41 (under the Fifth Amendment, statements stemming from custodial interrogation must be excluded unless the State shows it used procedural safeguards, i.e., *Miranda* warnings, to secure the defendant's privilege against self-incrimination).

Issue 2: *Was the post-*Miranda *statement Guein made given voluntarily and therefore admissible in evidence?*

The State agrees with the district court and Judge Gardner's dissent by arguing Weber's pre-*Miranda* statements—made as he walked the handcuffed Guein to the patrol car—were not coercive. So it argues Guein's post-*Miranda* statement that he was there to sell marijuana to Gresham was voluntary and thus properly admitted in evidence.

When a defendant claims his or her statements to police were not voluntary, the State bears the burden to prove the voluntariness by a preponderance of the evidence. *State v. Garcia*, 297 Kan. 182, 188, 301 P.3d 658 (2013). A case-by-case evaluation is employed to determine whether—as alleged here—coercion was impermissibly used in obtaining a statement. See *State v. Swanigan*, 279 Kan. 18, 44, 106 P.3d 39 (2005). And to determine whether the statement was the product of the defendant's free and

19

independent will, this court examines the totality of the circumstances surrounding it and determines its voluntariness by considering the following list of nonexclusive factors:

> "'(1) the accused's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the accused to communicate on request with the outside world; (4) the accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language.' [Citation omitted.]" *State v. Stone*, 291 Kan. 13, 21, 237 P.3d 1229 (2010) (quoting *State v. Johnson*, 286 Kan. 824, 836, 190 P.3d 207 [2008]).

In *State v. Sharp*, 289 Kan. 72, 81, 210 P.3d 590 (2009), this court described the weight a court should give these six factors:

> "'[T]hese factors are not to be weighed against one another . . . , with those favorable to a free and voluntary confession offsetting those tending to the contrary. Instead, the situation surrounding the giving of a confession may dissipate the import of an individual factor that might otherwise have a coercive effect. [Citation omitted.] Even after analyzing such dilution, if any, a single factor or a combination of factors considered together may inevitably lead to a conclusion that under the totality of circumstances a suspect's will was overborne and the confession was not therefore a free and voluntary act.' [Citations omitted.]"

The judicial determinations of whether a person (1) voluntarily waived *Miranda* rights and (2) voluntarily produced a statement usually are separate. In other words, one can make a voluntary waiver of his or her *Miranda* rights but still produce an involuntary confession. But sometimes, as here, whether the defendant waived *Miranda* rights can be virtually indistinguishable from whether the defendant's statement was voluntary. See *State v. Mattox*, 280 Kan. 473, 483-84, 124 P.3d 6 (2005).

The panel majority held the State failed to meet its burden to show that Guein's post-*Miranda* statements were voluntary. In particular, after reviewing the language during Weber's pre-*Miranda* walk and talk with Guein, it emphasized Weber made threats that coerced Guein's later self-incriminating statements. It pointed out Guein had his hands cuffed behind him when Weber told him, "Don't fuck around with me, and I ain't gonna fuck around with you." The majority agreed with Guein that "[t]he standard for a [non]coercive environment should rise far above a level where an individual needs to fear what a law enforcement officer might mean by threatening to 'fuck around with' them." *State v. Guein*, 53 Kan. App. 2d at 410. Among other things, the majority underscored Guein's then being left alone in the patrol car to contemplate what these words could, or likely would, mean.

The majority also ruled that Weber's rapid, dismissive reading of *Miranda* rights to Guein because Weber "has to" is not sufficient to overcome the vague or implied threat of physical harm or legal consequences that Weber would subject him to if he did not answer the questions in a way that was consistent with Weber's expectations. *State v. Guein*, 53 Kan. App. 2d at 411. We agree with the majority that the context in which Weber gave the *Miranda* warnings is significant in determining whether the State showed Guein's statements were voluntarily made.

We begin our voluntariness analysis by recalling the language of the United States Supreme Court:

> "Our cases have made clear that a finding of coercion need not depend upon actual violence by a government agent; a credible threat is sufficient. As we have said, 'coercion can be mental as well as physical, and . . . the blood of the accused is not the only hallmark of an unconstitutional inquisition.'" *Arizona v. Fulminante*, 499 U.S. 279, 287, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991).

21

Indeed, K.S.A. 2018 Supp. 60-460(f) recognizes this principle by providing in relevant part:

> "Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible except:
>
> . . . .
>
> "(f) *Confessions.* In a criminal proceeding as against the accused, a previous statement by the accused relative to the offense charged, but only if the judge finds that the accused . . . (2) was not induced to make the statement:  (A) Under compulsion or by infliction or threats of infliction of suffering upon the accused."

See *State v. Swanigan*, 279 Kan. at 28-36; see also *State v. McCarther*, 197 Kan. 279, Syl. ¶ 4, 416 P.2d 290 (1966) (confession inadmissible when elicited by force or threats).

The dissent would have affirmed the district court. It contended the majority made no effort to apply the factors it should have considered in determining whether Guein's statement was voluntary. Summarized, those factors and the dissent's analysis include: (1) Guein's age, intellect, and background (a college-educated 27-year-old who, while having very little experience with the police, lived in an area he considered "hood"); (2) Guein's fluency with the English language; (3) Guein's mental condition (no mental problems, sober, and able to respond to Weber's questions); (4) Guein's ability to communicate on request with the outside world (after his arrest and while sitting in the police car Guein asked if he could call his "lady friend," which he was later permitted to do from jail); (5) the manner and duration of the interview (relatively short and conversational, with a 10-minute gap between the "profane" statements and the *Miranda* warning, during which Guein had time to reflect); and (6) the officer's fairness in conducting the interview (Guein alleges no post-*Miranda* unfairness, and the officer's

22

pre-*Miranda* profanity was not coercive to Guein because he uses the same language). 53 Kan. App. 2d at 415-16.

The dissent dutifully considered all six factors—which it acknowledged are nonexclusive. But of course the strength of only a factor or two can render a statement involuntary. *State v. Randolph*, 297 Kan. at 326 ("'[A] single factor . . . may inevitably lead to a conclusion that under the totality of circumstances a suspect's will was overborne and the confession was not therefore a free and voluntary act.'"). For example, in *State v. McCarther*,197 Kan. 279, a burglary suspect was lying face down outside with his hands cuffed behind his back when an officer drew his pistol, held it to the suspect's head, and said, "'After a deal like this, I should blow this punk's brains out.'" 197 Kan. at 282. The officer admitted he also had raised his foot and held it over the suspect's head one time. The court ruled the ensuing confession was involuntary. Under such circumstances, factors such as the suspect's age, intellect, background, fluency with the English language, and duration of the interview obviously have little weight. Cf. *Buck v. Davis*, 580 U.S. __, 137 S. Ct. 759, 777, 197 L. Ed. 2d 1 (2017) ("Some toxins can be deadly in small doses.").

As a result, as explained below, we conclude the dissent undervalues the gravity of this episode. We conclude, like the majority, that taken in context, it would not be unreasonable for a person to have determined Weber made an implied threat that was connected to answering the questions in the way he wanted.

En route to this conclusion, for several reasons we specifically reject the State's related argument that Guein, as a college-educated man who brought a gun with him to a meeting where he intended to sell marijuana, would not have been affected by the use of Weber's language. First, profanity is often used for emphasis and reinforcement. So we agree with the panel majority that its use here "amplified the serious nature of the

statements being made, as the use of any particularly strong language, forcefully said, might do." *State v. Guein*, 53 Kan. App. 2d at 411.

Second, we note how context changes the use of language and its connotations. For example, we contrast the title of the popular movie "Whiskey Tango Foxtrot" (and what the military's phonetic "Foxtrot" stood for there, i.e., "<u>W</u>hat <u>t</u>he <u>f</u>uck?"), with an armed police officer's instruction to an arrestee: "Don't fuck around with me and I ain't gonna fuck around with you, okay? You hear me?" and, "Don't fuck with me, okay? You hear me?" And consider the language is directed to an arrestee cuffed from behind and being walked across the parking lot of a closed business to the officer's patrol car at 1:30 a.m.—when eyewitnesses are unlikely.

Just a few cases illustrate why in this context a reasonable person would associate such profanity with violence. In *Cordell v. McKinney*, 759 F.3d 573, 576-78 (6th Cir. 2014), a jail inmate requested a haircut. The deputy sheriff replied, "'Don't fuck with me about being put on the haircut list, or your sorry ass won't get one.'" The inmate responded with some version of, "'Fuck you, you sawed-off piece of shit,'" which earned him a trip to a holding cell on another floor. Before the trip, the deputy handcuffed the inmate behind his back. According to the inmate, during the walk he turned and tried to face the deputy. The deputy raised the inmate's cuffed arms and—outside the surveillance camera's view—rammed his head into a concrete wall, cutting his forehead. The inmate's blood was found on the wall and floor. At the hospital he received five stitches and was diagnosed with "neck pain following whiplash-type injury." 759 F.3d at 579.

In *State v. Filiaggi*, 86 Ohio St. 3d 230, 714 N.E.2d 867 (1999), a woman filed criminal charges for domestic violence and brought a complaint for other crimes against her ex-husband (the defendant). He broke into a house, and just before fatally shooting her multiple times with a pistol, twice told her, "'This will teach you . . . to fuck with

24

me.'" 86 Ohio St. 3d at 232, 248. Similarly, in *State v. Anderson*, 710 N.W.2d 392, 397 (N.D. 2006), when the defendant was asked why he carried weapons—a handgun and AK-47 rifle—he replied, "'In case the law tries to fuck with me!'" In *DeLuca v. Lord*, 77 F.3d 578 (2d Cir. 1996), the defendant and her female friend met three men at a bar early one morning. After all of them left the bar, the defendant returned to use the bathroom and upon leaving told several patrons, "'I'm an ex-cop and these guys better not fuck with me because I'll kill them.'" 77 F.3d at 580. She was eventually convicted of killing one of the men several hours later.

Here, we have an armed officer during a walk and talk who twice essentially tells an arrestee (handcuffed behind his back) "[d]on't fuck with me"—when I "ask you some questions here in a little bit" because "I know what you're doing out here [a drug deal]" and "I'm telling you right now, I know what's going on, all right?" The arrestee is then immediately placed alone in a patrol car to think about what this meant—for a yet-to-be determined amount of time. His contemplation is followed 10 minutes later by a rapid, dismissive reading of the *Miranda* warning—including Guein's right to remain silent— that the officer says "I've gotta" give.

This sequence indicates that arrestee Guein had better not be silent because that would show he was "fuck[ing] around" and not "be[ing] honest" with Weber who twice told Guein he knew why Guein was there. Right after being *Mirandized,* Guein agreed to talk. Cf. *State v. Swanigan*, 279 Kan. at 38 ("[W]e fail to see how law enforcement can be required by *Miranda* to advise Swanigan of his right to remain silent, and then can be allowed to warn him of punishment for his 'noncooperation' when he exercises that right."). So we agree with the panel majority that Weber's language implied physical violence toward Guein, prompting his later incriminating statement.

25

"[A]n extrajudicial confession will not be received in evidence unless it has been freely and voluntarily made. If it has been extorted by fear . . . it will be excluded as involuntary." *State v. Garcia*, 297 Kan. at 196. As a result, we affirm the Court of Appeals majority on this issue.

We remand to the district court for further proceedings.

\* \* \*

STEGALL, J., concurring in part and dissenting in part:  I would affirm the lower courts' decisions to allow Guein's pre-*Miranda* statements into evidence. As such, I dissent from the portion of today's decision ordering the suppression of that evidence. In my view, the Court of Appeals correctly applied the *Lewis* factors and concluded that "this portion of the encounter was much like a traffic stop, ordinarily considered an investigatory detention not requiring *Miranda* warnings." *State v. Guein*, 53 Kan. App. 2d 394, 405, 388 P.3d 194 (2017); see *State v. Lewis*, 299 Kan. 828, 835, 326 P.3d 387 (2014) (listing eight "[f]actors to consider in determining if an interrogation is investigative or custodial").

I agree, however, with the majority that Guein's post-*Miranda* statements were not voluntary and must be suppressed. Though I do not find the use of profanity nearly as significant as the majority does. The majority relies heavily on the use of the word "fuck" to reach its conclusion, going so far as to hold that "in this context a reasonable person would associate such profanity with violence." Slip op. at 24. I disagree. Indeed, the ubiquity of profanity—the word "fuck" in particular—has effectively sapped its once vaunted ability to shock, frighten, or offend. See Dunn, On Cussing:  Bad Words and Creative Cursing 17 (2019) (lamenting the "potent word being drained of all its juice and snap by overuse"); McWhorter, *Swearing In*, The New Republic, March 22, 2011,

26

https://newrepublic.com/article/85504/curse-words-pop-music-cee-lo (explaining that "in real language, yesterday's hot stuff is always today's papier-mache. Hence language change is not only a matter of people giving up *prithee* and *forsooth*, but one of *The New Yorker* printing *shit* and ordinary people texting WTF 24/7"); see also Fairman, *Fuck*, 28 Cardozo L. Rev. 1711, 1720 (2007) (describing the ubiquity of the word: "One recent Internet search revealed that fuck 'is a more commonly used word than mom, baseball, hot dogs, apple pie, and Chevrolet.'").

Simply put, in my judgment, law enforcement's use of the word "fuck" does not make the circumstance more or less coercive. Guein was not coerced because of his tender ears, but because of a real and actionable threat. And the practical problem with the majority's reasoning is that it suggests a politely worded threat is less coercive than a vulgar one.

BILES, J., joins in the foregoing concurring and dissenting opinion.