NOT DESIGNATED FOR PUBLICATION

No. 122,784

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JAMES D. DAYVAULT,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; KEVIN J. O'CONNOR, judge. Opinion filed February 11, 2022. Affirmed.

*Jennifer C. Bates*, of Kansas Appellate Defender Office, for appellant.

*Julie A. Koon*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before BUSER, P.J., POWELL and HURST, JJ.

PER CURIAM:  James D. Dayvault appeals his convictions for sexual exploitation of a child, lewd and lascivious behavior, breach of privacy, and attempted breach of privacy, alleging that the events leading to his arrest violated his constitutional rights—poisoning the very root of the evidentiary tree leading to his convictions. Dayvault specifically contends the district court erred by denying his motion to suppress and motion to reconsider such denial. This court disagrees and affirms.

1

On June 20, 2017, the Wichita Police Department received a "suspicious character call" about a man taking pictures of a young girl in a bathing suit in the yard of a residential area. The witness was in her vehicle when she saw what she believed to be a white man with curly dark hair and a scruffy beard taking pictures of a child's bottom, so she followed him as he got into a white Dodge Intrepid and took down the license plate information. Another witness reported seeing a man with the same physical description driving a white Intrepid around the block a couple of times and then hiding behind a tree that same afternoon.

Based on the license plate information provided by the witnesses, officers eventually found a car matching the description registered to a man named James Dayvault. Wichita Police Officers Rex Leffew and Brook Rosenboom went to speak with Dayvault at his home. Dayvault answered the door wearing a white shirt and stepped outside onto his front porch where Officer Leffew informed him of the reports about a man in the area fitting his description taking pictures of a young girl's bottom. Within less than one minute of first speaking to Dayvault, Officer Leffew quickly asked Dayvault, "Was that you? Don't lie to me." Dayvault then nodded his head in agreement, and mumbled affirmatively. Officer Leffew confirmed that Dayvault was saying "yes"—that it was him taking the photos.

After this admission, Officer Leffew asked if Dayvault had any identification on him, and Dayvault provided his driver's license. As Officer Leffew looked over the license, Officer Rosenboom patted Dayvault down to check for weapons, and upon feeling unidentified items in Dayvault's pockets, Officer Rosenboom received permission from Dayvault to put his hands inside Dayvault's pockets. Officer Rosenboom placed the contents, including Dayvault's wallet and cell phone, on a nearby table. While he was being patted down, Dayvault asked if he was under arrest; Officer Leffew responded

2

"you're not under arrest at this time" and explained that the pat-down was strictly for officer safety.

At Officer Leffew's request, Dayvault sat down on the porch steps, and then commented, "This is freaking me out." As he continued to speak with Officer Leffew, Dayvault attempted to walk back his prior admission, stating that he was not taking pictures. He said, "I know the girl you're talking about," and said that he saw her when he was out looking for a place to dump his trash because he does not have trash service. Officer Leffew then reminded Dayvault that he had already admitted to taking pictures of the child's bottom. Shortly thereafter, Dayvault's fiancée came out of the house and Officer Rosenboom took her to the sidewalk to discuss why the officers were at the house.

While Officer Rosenboom spoke to Dayvault's fiancée, Officer Leffew obtained additional identifying and background information from Dayvault about himself and his car. Dayvault then stood up, touched his face, put his hands in his pockets, and walked around for a moment while Officer Rosenboom was in a different area talking to dispatch, and Officer Leffew asked him to "just have a seat for me man, relax okay, relax,"—which Dayvault did. Soon after Dayvault sat back down, Officer Leffew asked him what he was doing earlier in the nearby neighborhood. Dayvault said, "exactly what you came to talk to me about, taking pictures." Dayvault then admitted to taking photos of "a little kid" wearing a bikini for his fantasies. Dayvault made this admission while speaking to just one officer, within minutes of when the officers first began talking to him.

After Dayvault again admitted to taking photos of the child for his sexual gratification, Officer Leffew asked where his phone was; Dayvault pointed back to the table on the porch where Officer Rosenboom had left it after patting him down. Dayvault then clarified that he failed to get a picture of the child and had only captured the ground;

3

he claimed he had already deleted the photograph. No other officers were present while Dayvault sat on his porch and talked to Officer Leffew.

Officer Leffew then asked Dayvault if he had ever been arrested before. Dayvault said he had not, and then spontaneously stated that he knew he needed to go back to Sex Addicts Anonymous. After a minute of silence, their conversation continued:

> Dayvault: "What I really know is that I need help.
> . . . .
> Officer Leffew: "So what was your reason, your actual reason for going over there in that area of town?
> Dayvault: "My actual reason was to look for a place to dump some trash. I find an empty blue container.
> Officer Leffew: "Okay. And then you seen [*sic*] the kids.
> Dayvault: [nods head in agreement.]
> . . . .
> Dayvault: "What now?
> Officer Leffew: ". . . I just don't know yet.
> . . . .
> Dayvault: "Have any laws been broken?
> Officer Leffew: "That's what we gotta kinda figure out, too. . . . We're waiting for [his supervisor] to get here."

While waiting for his supervisor to arrive, Officer Leffew asked Dayvault about the alleged deleted picture of the girl in the bikini. Dayvault responded by asking if the officers planned to take his phone, to which Officer Leffew said he did not know. When Officer Leffew asked Dayvault "is this the first time you've done something like this?" Dayvault shook his head no and admitted that he had taken pictures of children "once before." Dayvault said he had recently taken photographs of other "fully clothed" children who were "just dancing around being silly" while playing in a yard near his father's house. Dayvault then gave the officers permission to look through his phone and

provided the passcode to open it; the officers found no incriminating pictures on the phone. Dayvault stated he only had the phone for about a month. Officer Rosenboom then put the phone back on the table.

After several minutes of general discussion about the weather and the propensity for aggression of the nearby dogs, Dayvault asked if he could go inside to talk to his fiancée. Officer Leffew said, "No, just stay right here for now, okay." Officer Leffew then continued speaking to Dayvault about general topics. Officer Leffew's supervisor, Lieutenant Sarah Oldridge, arrived at Dayvault's house after the officers had been at Dayvault's residence for approximately 20 minutes.

Lieutenant Oldridge spoke to Dayvault about the circumstances and Dayvault said, "I thought a not nude picture of a girl would be something I might later masturbate to." Dayvault also told Lieutenant Oldridge that he used to go to therapy and attended Sex Addicts Anonymous meetings for his "pornography addiction." But Dayvault denied having any images depicting the sexual exploitation of children on either his phone or computer. He also denied her request for permission to look through his personal computer, stating he wanted to "keep [his] private life private." Lieutenant Oldridge told Dayvault that she would make a report about their encounter and that she believed he had "something else on [his] computer that [he] probably shouldn't have." Dayvault again denied having any such material.

While Lieutenant Oldridge was speaking to Dayvault, Officer Leffew confirmed to Officer Rosenboom that he had not read Dayvault his *Miranda* rights because he did not know if he was going to be charged. Before ending the encounter, Lieutenant Oldridge seized Dayvault's phone to "attempt to apply for a search warrant for it." Throughout the encounter, officers never placed Dayvault in handcuffs or a patrol car, and did not arrest him.

5

After obtaining search warrants to search Dayvault's cell phone and two of his email accounts, detectives found multiple illicit videos Dayvault had recorded up the skirts of unsuspecting women as well as numerous images depicting the sexual exploitation of minors.

Ultimately, the State charged Dayvault with
- one count of sexual exploitation of a child for the images found on his phone;
- one count of lewd and lascivious behavior based on a video taken the day of Dayvault's encounter with the officers, which showed several children playing and Dayvault masturbating nearby behind a tree;
- two counts of breach of privacy for videos he recorded trying to secretly look up women's skirts; and
- two counts of attempted breach of privacy for other similar, up-skirt videos.

Dayvault filed a motion to suppress, arguing (1) he was subjected to a custodial interrogation and was not advised of his *Miranda* rights when he spoke to Officer Leffew, Officer Rosenboom, and Lieutenant Oldridge; and (2) the warrantless seizure of his cell phone was not excused by the probable cause plus exigent circumstances exception. After hearing testimony and watching the officers' bodycam footage, the district court denied Dayvault's motion and subsequently denied his motion to reconsider its decision.

Dayvault proceeded to a bench trial on stipulated facts. The court found Dayvault guilty of sexual exploitation of a child, lewd and lascivious behavior, one count of breach of privacy, and one count of attempted breach of privacy. Before sentencing, Dayvault filed a departure motion asking the court to impose probation. The district court denied Dayvault's motion and sentenced him to 57 months of imprisonment followed by lifetime postrelease supervision and lifetime registration as a sex offender.

Dayvault appeals, arguing the district court erred in denying his motion to suppress.

When opposing a motion to suppress evidence, the State bears the burden of proof that the search and any ultimate seizure were lawful. *State v. Regelman*, 309 Kan. 52, 58, 430 P.3d 946 (2018). On appeal, this court reviews a district court's decision on a motion to suppress in two steps. First, this court reviews the district court's factual findings to determine whether they are supported by substantial, competent evidence, which is legal and relevant evidence that a reasonable person would find sufficient to support a conclusion. Second, this court examines the district court's ultimate legal conclusions de novo, without reweighing evidence, assessing the credibility of witnesses, or resolving conflicts in the evidence. When the significant facts are not in dispute, the district court's decision to grant or deny a suppression motion presents a question of law over which this court has unlimited review. *State v. Guein*, 309 Kan. 1245, 1252, 444 P.3d 340 (2019).

Here, Dayvault raises two distinct suppression-based arguments. First, he claims that the State violated his rights under the Fifth Amendment to the United States Constitution when it subjected him to custodial interrogation and failed to provide him a *Miranda* warning. Second, he claims that the State violated his Fourth Amendment rights when it seized his phone without first obtaining a warrant.

I. DAYVAULT WAS NOT SUBJECT TO CUSTODIAL INTERROGATION WHEN HE MADE INCRIMINATING STATEMENTS

Dayvault argues the district court should have suppressed the statements he made to the officers at his house because he was being interrogated while in custody and was not given the warnings required in such situations by *Miranda v. Arizona*, 384 U.S. 436,

7

86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The Fifth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, protects an individual's right against self-incrimination and includes both the right to have a lawyer present during custodial interrogation and the right to remain silent. In *Miranda*, the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from *custodial interrogation* of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." (Emphasis added.) 384 U.S. at 444. These safeguards include the requirement that a law enforcement officer inform a person in custodial interrogation of their "right to remain silent," and "that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444. These are known as *Miranda* warnings.

However, the requirement to provide *Miranda* warnings is "not intended to hamper the traditional function of police officers in investigating crime. . . . General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. [Citation omitted.]" 384 U.S. at 477. *Miranda* warnings are therefore required only for custodial interrogations—not for investigatory, noncustodial interrogations. *State v. Jacques*, 270 Kan. 173, 186, 14 P.3d 409 (2000); *State v. Vanek*, 39 Kan. App. 2d 529, 532, 180 P.3d 1087 (2008) (noting these constitutional protections applied only to custodial interrogations, not to "general on-the-scene police questioning of a suspect in the fact-finding process").

Law enforcement officers are required to give the accused a *Miranda* warning only when the accused is (1) in custody; and (2) subject to interrogation. *Guein*, 309 Kan. at 1253. "A custodial interrogation is defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his or her freedom in any significant way." *State v. Lewis*, 299 Kan. 828, 834, 326 P.3d 387 (2014). A custodial interrogation is "distinguished from an investigatory interrogation, which

8

occurs as a routine part of the fact-finding process before the investigation reaches the accusatory stage." 299 Kan. at 835. By contrast, any statements made during a custodial interrogation are inadmissible "unless the State demonstrates the use of procedural safeguards to secure the defendant's privilege against self-incrimination." *State v. Hebert*, 277 Kan. 61, 68, 82 P.3d 470 (2004). When, as here, a defendant moves to suppress the use of a confession or admission on the grounds that it is inadmissible, the State bears the burden to prove the challenged statements are admissible. K.S.A. 22-3215(4); *Lewis*, 299 Kan. at 835-36.

Whether a person is in custody depends upon the circumstances of the individual encounter. This court employs a de novo standard to determine whether, under the totality of those circumstances, a reasonable person would have felt free to terminate the interrogation and disengage from the encounter. *State v. Warrior*, 294 Kan. 484, 497, 277 P.3d 1111 (2012). This court reviews the circumstances without reweighing evidence, assessing witness credibility, or resolving conflicting evidence. Here, the facts are not in dispute as the officers' body cameras recorded most of the interaction with Dayvault—the parties' disagreement lies only in the application of these facts to the law.

Kansas courts look to several nonexclusive factors when determining whether an interrogation is investigative or custodial, including:

> "(1) the interrogation's time and place; (2) its duration; (3) the number of law enforcement officers present; (4) the conduct of the officer and the person questioned; (5) the presence or absence of actual physical restraint or its functional equivalent, such as drawn firearms or a stationed guard; (6) whether the person is being questioned as a suspect or a witness; (7) whether the person questioned was escorted by officers to the interrogation location or arrived under his or her own power; and (8) the interrogation's result, e.g., whether the person was allowed to leave, was detained further, or was arrested after the interrogation." *Lewis*, 299 Kan. at 835.

Our Kansas Supreme Court has cautioned that none of these factors is dispositive, nor do they necessarily bear equal weight—courts must analyze every case on its own particular facts and circumstances. *Warrior*, 294 Kan. at 496-97.

The district court pointed to several factors when it determined Dayvault was not in custody during the law enforcement questioning:

(1) the interview took place on Dayvault's porch in the afternoon;

(2) the questioning occurred sporadically over the course of about an hour;

(3) only three officers spoke with Dayvault and they did so one at a time;

(4) the officers were conversational and permitted Dayvault to speak with his fiancée;

(5) Dayvault was not allowed to leave his porch but was never placed in handcuffs;

(6) Dayvault voluntarily agreed to speak with the officers and was not escorted to a different location for interrogation; and

(7) Dayvault was not arrested after the interview.

Dayvault disputes this analysis, arguing a reasonable person in his situation would not have felt free to terminate the conversation with the officers on his doorstep. Dayvault points to the fact that the encounter took around an hour, included multiple officers who treated him as a suspect, and that he was not free to leave nor allowed to look at his phone. He further contends that the district court incorrectly examined certain factors when it found the interview was not custodial. This court is charged with analyzing these same factors to determine whether Dayvault was in custody during the questioning by the police officers on his front porch, and thus required to receive *Miranda* warnings. Some of the circumstances here weigh in favor of Dayvault being in custody at some point during the interview, but most demonstrate that Dayvault was not in custody when he made incriminating statements during the interview.

10

*The Interrogation's Time and Place*

Dayvault concedes that the time and place of the interrogation—on his own porch in the middle of the afternoon—does not support his argument that the encounter was custodial. In this familiar setting, Dayvault did not face "the same pressures as one questioned in a police-dominated atmosphere" and this factor weighs against a conclusion that the interview was custodial. See *Warrior*, 294 Kan. at 497.

*Duration of Interrogation*

The entire encounter between the officers and Dayvault, from the time Dayvault stepped out on his porch to when the officers left, appears to have lasted about an hour. As noted by the district court, the officers were not questioning Dayvault for much of this time, but rather engaging in small talk and waiting for Lieutenant Oldridge to arrive and determine the next steps. While the entire length of the encounter was not brief, it was not exceedingly long and the direct questioning was brief. See *State v. Summers*, 293 Kan. 819, 826, 272 P.3d 1 (2012) (finding an interview of 30-45 minutes noncustodial); *State v. Ninci*, 262 Kan. 21, 36-38, 936 P.2d 1364 (1997) (finding a 1-hour interview noncustodial). The length of Dayvault's interview alone does not support a finding that it was custodial.

Even so, courts have analyzed this factor considering "whether officers immediately exert their authority or ask questions without advising the person he or she is free to leave or to decline answering them." *Guein*, 309 Kan. at 1255. Here, Officer Leffew began asking Dayvault questions about whether he was the reported suspicious character upon arrival. By contrast, Officer Leffew did inform Dayvault that he was not under arrest and that the officers were not sure if a crime had been committed at that time. Additionally, Dayvault made his incriminating statements to officers within fewer than 10 minutes of the officer's arrival. If considering only the statements made before

11

Dayvault requested to reenter his home, that timeframe was only 20 minutes. On total, this factor favors both parties.

*The Number of Law Enforcement Officers Present*

At first, only two officers were present at the scene talking to Dayvault—Officer Leffew and Officer Rosenboom. During most of the encounter only one officer spoke with Dayvault at a time. During the majority of the encounter, Officer Rosenboom spoke to Dayvault's fiancée, moved Officer Leffew's car, and stood some distance from Dayvault without engaging in questioning. Dayvault asserts that up to four or five officers were present during the encounter—but this occurred only after Dayvault had made the vast majority of his incriminating statements.

While it is true that additional officers eventually arrived, only Lieutenant Oldridge engaged in any conversation with Dayvault—another officer went behind Dayvault's house to look at Dayvault's car. At any given moment during the encounter, no more than two officers at a time were present on the porch with Dayvault. See *Warrior*, 294 Kan. at 498 (presence of two officers did not impact decision about custody). But see *Guein*, 309 Kan. at 1256 ("while only two officers were involved, their one-to-one ratio to the car's occupants allowed a show of authority specific to each"). Here, the number of officers present when Dayvault admitted to secretly photographing children for his fantasies provides little support that the interrogation was custodial at that time.

*The Conduct of the Officers and Dayvault*

While the officers began asking Dayvault if he had been taking pictures of children just after knocking on his door, their demeanor throughout the encounter was casual and conversational, and they told Dayvault they were unsure if he committed a

12

crime. Moreover, Dayvault almost immediately admitted to trying to take pictures of the child in the bikini, and the officers did not employ any coercive or intimidating tactics to get Dayvault to talk. See *Oregon v. Elstad*, 470 U.S. 298, 314, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985) ("[A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion.").

In fact, much of the conversation between the officers and Dayvault related to topics like Dayvault's fiancée, his dog, the neighbor's dog, and other crimes going on in the neighborhood. While Dayvault was asked to sit and relax at one point, the officers also permitted him to pace around the porch and speak to his fiancée during other parts of the encounter. Our Kansas Supreme Court has explained that the fact that officers focused their suspicions upon the individual being questioned is not relevant for purposes of *Miranda* if those suspicions are not disclosed to the defendant. *State v. Ewing*, 258 Kan. 398, 401-03, 904 P.2d 962 (1995) (holding an officer's knowledge or beliefs may influence the custody issue if those suspicions are being conveyed by word or deed to the individual being questioned, but they are relevant only to the extent they would affect how a reasonable person would gauge his or her freedom of action). To that end, Officer Leffew told Dayvault he was not under arrest several times during the interview and stated that he was not sure if Dayvault had committed any crimes.

It was clear the officers were first on a fact-finding mission, unsure if Dayvault was the "suspicious character" reported to officers and if Dayvault's admitted conduct constituted a crime. Dayvault even asked, "Have any laws been broken?"—indicating that he was unsure if police thought he had committed a crime. The officers' conduct and Dayvault's demeanor weigh against the questioning being classified as custodial. The officers repeatedly told Dayvault he was not under arrest, that they were not sure if a crime had been committed, and they were gathering information. This factor weighs in

favor of the interview being noncustodial because it lacked the type of intensity, accusations, and force of a custodial interrogation.

*Actual Physical Restraint or Its Functional Equivalent*

Dayvault was never placed in any physical restraints. Although one officer remained with or near Dayvault on his porch throughout the encounter, the officers never drew their weapons, nor did they appear to set any guard on him. See *State v. Bohanan*, 220 Kan. 121, 128, 551 P.2d 828 (1976) (holding a person not arrested is not in custody unless significant restraints have been placed upon that person's freedom of movement). Yet at one point during the encounter, Officer Leffew told Dayvault he could not reenter his home and should remain on the porch—which could, under some circumstances, constitute the functional equivalent of physical restraint. See *Regelman*, 309 Kan. at 55, 60 (officers ordering defendant to stop walking away and "'either sit on the steps or sit in my patrol car'" subjected him "'to the functional equivalent of physical restraint since he had been denied freedom of movement and was ordered to return to his porch [steps]'").

Approximately 20 minutes after the officers' arrival, Dayvault requested to go inside to talk to his fiancée, and Officer Leffew told him to stay on the porch. That was the first time Dayvault requested to leave the porch during the encounter. Dayvault contends that the entire interrogation was custodial because his movement was restricted to the porch. However, Dayvault's argument ignores the fact that he made the inculpatory statements supporting the seizure and search of his phone well before he requested to leave the porch. A fact-finding interview can become custodial through a change in circumstances, but such does not make the defendant's precustodial statements inadmissible. See, e.g., *Ninci*, 262 Kan. at 36 (upholding trial court's finding that first hour of three-and-a-half-hour interview was noncustodial).

14

It is unnecessary to decide if Officer Leffew's refusal to let Dayvault reenter his home constituted a functional equivalent to a physical restraint because any functional equivalent occurred well after Dayvault admitted his actions. In other words, Dayvault did not request to leave the porch until after he admitted to at least the following:

1. taking photos of a child in a bikini outside in a nearby neighborhood;
2. deleting the photo of the child in the bikini;
3. taking photos of the child in the bikini for purposes of his fantasies;
4. needing to go back to Sex Addicts Anonymous and needing help;
5. previously taking photos of clothed children while they were just "dancing around being silly"; and
6. no longer having the photos of children he previously took.

Dayvault was not physically restrained or under the functional equivalent of physical restraint when he made the aforementioned incriminating statements.

This court can assume for this analysis, without deciding, that Officer Leffew's refusal to let Dayvault reenter his home constituted a functional equivalent of physical restraint, and after that point this factor would weigh in favor of Dayvault being in custody. However, because Dayvault's incriminating statements occurred well before he asked to reenter his home, this factor favors the State for the relevant portion of the interview necessary for this case. This court need not determine whether Dayvault was physically restrained after he requested to reenter his home.

*Whether Dayvault Was Questioned as a Suspect or a Witness*

When the officers arrived at Dayvault's front door, they were responding to a call of a suspicious character, and Dayvault was a potential suspect. This is evident because Officer Leffew immediately asked Dayvault if he had been taking pictures of a little girl

15

and informed him that he fit the physical description given by the witnesses. While Lieutenant Oldridge stated that the encounter "was a very preliminary investigation to try to find out what is going on, after a recent report of somebody witnessing something," to the objective observer, Officer Leffew's questions suggested that he believed Dayvault was the *suspicious character* reported earlier. His inquiry was tailored to discovering Dayvault's identity and the extent of his involvement in any potential crimes. However, "the fact that a suspect is the focus of an investigation, standing alone, does not trigger the need for *Miranda* warnings." *State v. Bridges*, 297 Kan. 989, 1010, 306 P. 3d 244 (2013).

Although Dayvault was a suspect, it was clear, and a reasonable person in Dayvault's position would believe, that Officer Leffew was still in the investigatory phase of the case. Officer Leffew repeatedly told Dayvault he was unsure of the next steps and did not seem to know if Dayvault had broken any laws. An officer's "unarticulated plan" about whether a person will be arrested after an investigation "has no bearing on the question whether a suspect was 'in custody' at a particular time." *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984). Officer Leffew told Dayvault he did not know if they would take his phone. Dayvault was not arrested after he admitted to taking the photograph of the young girl—which was the entire catalyst for their interaction. See *State v. Jones*, 246 Kan. 214, 216, 787 P.2d 726 (1990) ("An investigatory interrogation is the questioning of a person by law enforcement officers in a routine manner in an investigation which has not reached an accusatory stage and where such person is not in legal custody or deprived of his freedom of action in any significant way.").

Throughout the encounter, the officers' questioning could reasonably be interpreted as either fact-finding or accusatory. As in *Berkemer*, the officers here never told Dayvault that he committed a crime and would be arrested. Rather, the officers continually said they were unsure of what would occur. While the district court found

16

Dayvault was treated as a suspect, there are factors here supporting both conclusions and this factor alone provides little to support that the encounter constituted custodial interrogation.

*How Dayvault Arrived at the Interrogation Location*

Officers questioned Dayvault on his porch after he voluntarily agreed to speak to the officers when they knocked on his door. He was never arrested, detained, or placed in any physical restraints during the interrogation. And he was never escorted off his property and taken to the police station for further questioning. This circumstance supports that the encounter was not a custodial interrogation.

*The Interrogation's Result*

After Dayvault provided his explanation for his actions that afternoon and explained his struggles with his sexual urges, the officers did not arrest him. The officers did ask him if he would be willing to come to the station and speak with detectives, but he declined. Dayvault's refusal to continue the questioning and his termination of the encounter demonstrates that it was not custodial. See *Lewis*, 299 Kan. at 837 (after interview, defendant was questioned further, detained, and arrested—a circumstance weighing in favor of custody). Toward the end of the encounter, Officer Rosenboom asked Officer Leffew if he had read Dayvault his *Miranda* rights. Officer Leffew replied that he had not because he did not know if Dayvault was going to be charged. While the officers decided to seize Dayvault's phone and apply for a warrant to search it, the outcome of the interview suggests that the officers were still conducting investigative fact-finding.

*The Totality of The Evidence Demonstrates that Dayvault Was Not Subject to Custodial Interrogation When He Made Incriminating Statements to Officers*

While there is no bright-line test to determine whether an individual is in custody under *Miranda*, the court looks to the totality of the circumstances. No one factor is determinative, and the factors are not necessarily given equal weight. Here, each party has factors that weigh in their favor, but this court must review the totality and determine whether a reasonable person in Dayvault's situation would believe they were free to terminate the questioning and disengage from the encounter. See, e.g., *Yarborough v. Alvarado*, 541 U.S. 652, 662-63, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004).

Here, the question is simpler than Dayvault suggests because he almost immediately—within just a couple of minutes of police arriving to his home—made the incriminating statements used to support the seizure and ultimate search of his phone. Dayvault's admission to his actions being investigated that day were all made almost immediately, before other officers arrived, before the expiration of much time, and before he requested to go back inside his home. The only statement in the search warrant application that Dayvault made after he requested to leave his porch was about wanting to masturbate to the photo of the child in the bikini, and that "'I have inappropriate urges about kids but have never touched any.'" However, that statement was just a reassertion of his prior statements that he wanted the photo of the child for his fantasies and that he needed to return to Sex Addicts Anonymous. Clearly, Dayvault made his incriminating statements during a noncustodial interview.

The majority of the circumstances of the entire encounter demonstrate Dayvault's admissions were made during a noncustodial interrogation. Dayvault was never taken into custody, never handcuffed, never had a gun pointed at him, and his freedom was not restrained in any significant way before his incriminating statements. Additionally, Dayvault effectively ended the encounter of his own accord when he ultimately declined

to continue questioning at the police station. Dayvault also asserted his rights and limited the scope of the interview by denying the officers access to his computer—which suggests that Dayvault knew he was not in custody. The interview was cordial, free from officer aggression or pressure, and often involved discussion of general matters, and the length of the entire encounter was not exceedingly long.

The totality of the circumstances buttresses the district court's finding that the officers were conducting an investigatory interrogation as "a routine part of [their] fact-finding process before the investigation reach[ed] the accusatory stage." *Lewis*, 299 Kan. at 835. While there might have come an instance where the interview morphed into a custodial interrogation necessitating the recitation of *Miranda* warnings, such a determination is unnecessary because it would have only occurred after Dayvault had already admitted to taking pictures of the child for his fantasies, and his statements that he knew he needed "help," and that he needed to return to Sex Addicts Anonymous. As explained below, the statements supporting the seizure of Dayvault's phone were all made early in the encounter—before Dayvault's request to reeenter his home.

Under these circumstances, the district court did not err in finding Dayvault was not in custody, and no reasonable person would have believed they were in custody, and thus the officers did not have to advise Dayvault of his *Miranda* rights nor obtain a waiver of those rights before Dayvault made incriminating statements.

## II. EXIGENT CIRCUMSTANCES EXCUSED THE WARRANTLESS SEIZURE OF DAYVAULT'S CELL PHONE

Dayvault also contends the district court erred in finding the officers' warrantless seizure of his cell phone was permissible under the probable cause plus exigent circumstances exception to the warrant requirement. The Fourth Amendment to the United States Constitution prohibits government actors from performing unreasonable searches or seizures. A warrantless search is always unreasonable unless an exception to

19

the warrant requirement applies. *State v. Chavez-Majors*, 310 Kan. 1048, 1053, 454 P.3d 600 (2019). Kansas recognizes several such exceptions, including:

- consent;
- search incident to a lawful arrest;
- stop and frisk;
- the emergency doctrine;
- inventory searches;
- plain view or feel;
- administrative searches of closely regulated businesses; and
- (relevant here) probable cause plus exigent circumstances.

*State v. Rupnick*, 280 Kan. 720, 727, 125 P.3d 541 (2005).

Although Dayvault gave officers permission to look through his phone, he did not consent to the officers' seizure of it. The State never argued to the district court or on appeal that the seizure was excused under the consent exception.

Rather, the State contended that exigent circumstances permitted seizure of the phone. The exigent circumstances exception excuses a warrantless search or seizure where (1) there is probable cause to believe a crime was committed; and (2) exigent circumstances justify an immediate search or seizure. See *State v. Houze*, 23 Kan. App. 2d 336, 337, 930 P.2d 620 (1997). Probable cause exists where "the facts and circumstances within the knowledge of the officer making the arrest or search, and of which he had reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *State v. Hays*, 221 Kan. 126, Syl. ¶ 1, 557 P.2d 1275 (1976). An exigent circumstance exists when a police officer "'believes there is a threat of imminent loss, destruction, removal, or concealment of evidence or contraband. In each case, the particular facts

must be considered.'" *State v. Hubbard*, 309 Kan. 22, 29, 430 P.3d 956 (2018). Yet this exception does not stretch to situations when only a *mere possibility* that evidence could be destroyed or concealed exists. *State v. Fewell*, 286 Kan. 370, 385, 184 P.3d 903 (2008). Rather, exigent circumstances must be based on what a reasonable law enforcement officer would conclude from the information available at the time of entry. *State v. Dugan*, 47 Kan. App. 2d 582, 606, 276 P.3d 819 (2012).

Here, the officers seized Dayvault's cell phone after interviewing him on the porch and upon leaving without arresting him. Dayvault admitted to taking pictures of children with his phone "once before" for his fantasies. When the officers received Dayvault's permission to look through his phone, they found nothing incriminating. But Lieutenant Oldridge noted that "it was likely that there might be something—if there is a photograph on there that he deleted . . . . in order to continue to investigate, [she believed] that it's still going to be on the phone, even though he deleted it." The district court found that this warrantless seizure was justified because the officers had probable cause to believe that Dayvault's phone contained illegal photographs or videos of minors and that exigent circumstances existed because of the likelihood that Dayvault would destroy the evidence if the phone was not immediately seized.

Dayvault contends the officers lacked probable cause because they were unable to locate any illicit materials when they searched his cell phone. Dayvault's argument overlooks several key details informing the officers' beliefs, and the common knowledge that even deleted digital images can be recovered. Several witnesses saw Dayvault taking pictures of children and acting "suspiciously," and Dayvault admitted he sought to take those photographs to satisfy his fantasies. Although Dayvault's descriptions of the content of the photos may not have been illegal, his admittedly surreptitious photography and stated proclivities gave the officers reason to disbelieve his account. While Dayvault claimed to have deleted the photographs, he told officers that he needed help and needed to return to Sex Addicts Anonymous. He also said that this was not the first time he had

21

engaged in such behavior. While the officers did not know the exact contents of these photographs, they knew that the files might still be accessible even though Dayvault claimed he had deleted them. As Lieutenant Oldridge explained:

> "Based on our very preliminary investigation out there at the scene and what we could do out there, I believed that it was likely that there might be something—if there is a photograph on there that he deleted, that he said he deleted. I'm not sure what that photograph contained. So if that was deleted by him off the phone, I really don't know what it had on it. But in order to continue to investigate, I believe that it's still going to be on the phone, even though he deleted it."

The facts and circumstances within the knowledge of Lieutenant Oldridge and Officer Leffew were sufficient to warrant a reasonable belief, beyond a mere possibility, that an offense had been committed and that evidence was still located in Dayvault's phone.

Based on Dayvault's various admissions, the officers had probable cause to believe a crime had been committed, so the next question is whether exigent circumstances justified the warrantless seizure of Dayvault's phone. In conducting this analysis, our Kansas Supreme Court has looked to several factors, including:

> "'(1) the time needed to secure a search warrant; (2) the reasonableness of the officers' belief the evidence may be immediately lost; (3) potential danger to the officers guarding the site while awaiting a warrant; (4) whether those persons with possession of the evidence are aware of the officers' presence; and (5) the ease with which the evidence might be destroyed or hidden. [Citations omitted.]'" *Hubbard*, 309 Kan. at 42.

Other relevant factors Kansas courts may consider include:

- the gravity or violent nature of the offense;
- whether the suspect is armed and dangerous;

22

- a clear showing of probable cause;
- the likelihood the suspect will escape if not swiftly apprehended; and
- the peaceful circumstances of the officers' entry.

*State v. Weas*, 26 Kan. App. 2d 598, 601, 992 P.2d 221 (1999) (quoting *State v. Platten*, 225 Kan. 764, 770, 594 P.2d 201 [1979]).

In ruling on Dayvault's motion to suppress, the district court focused primarily on the fact that the officers' seizure of Dayvault's phone was permissible to ensure the preservation of evidence—that is, to prevent Dayvault from further deleting any photographs, videos, or files. Dayvault asserts that the circumstances were not sufficient to rise to the level of exigent circumstances "because the alleged act that brought law enforcement to his residence was not even criminal." Dayvault seems to imply officers were required to prove he committed a crime before seizing the phone, but that is not the case—officers need only a reasonable belief that Dayvault committed a crime. Dayvault's own admissions, coupled with the witness statements, provided officers with that reasonable belief. They were not required to believe Dayvault's self-serving denials when his open admissions were plentiful.

Here, the officers were concerned about the potential loss of evidence from Dayvault's cell phone—and Dayvault had already admitted to deleting photos taken that afternoon. Dayvault was plainly aware of the officers' presence and could have easily destroyed any potential evidence by destroying or "losing" his cell phone. Thus, the officers' belief that any evidence contained on Dayvault's phone, whether it be pictures he had taken of children, or other potential files containing the sexual exploitation of children, was reasonable. While the officers did not find any such pictures when they briefly searched the phone with Dayvault's consent, they knew that deleted photographs could still be located on the device so long as the device itself was still intact. While the offenses the officers reasonably believed Dayvault committed, based on witness statements and his immediate admissions, were not violent, they were certainly grave.

23

Both Dayvault and the State cite *Rupnick*, 280 Kan. 720, for support of their arguments. In that case, our Kansas Supreme Court discussed the probable cause plus exigent circumstances exception to the warrant requirement in the context of a seizure and search of a computer which contained information about a gambling operation. But *Rupnick* stands for the proposition that "a valid warrant is necessary to search the hard drive of a suspect's personal computer." 280 Kan. at 732. Both parties agree that a modern cell phone is the functional equivalent to a computer. See *State v. Isaac*, No. 101,230, 2009 WL 1858754, at *4 (Kan. App. 2009) (unpublished opinion).

Dayvault does not dispute the fact that the officers were able to obtain a warrant to thoroughly search the phone after they had seized it. Relevant here, the *Rupnick* court concluded that the officers' warrantless seizure of the computer in the first place was excused under the probable cause plus exigent circumstances exception. As in *Rupnick*— where the defendant admitted to the content on the laptop—here, there was a clear showing of probable cause to believe that evidence of criminal activity was contained in Dayvault's phone when he admitted to surreptitiously photographing children for his fantasies. Moreover, there was a present threat of the imminent loss, destruction, removal, or concealment of evidence because of how easily Dayvault could have destroyed that evidence. Because there was a real possibility that evidence could have been destroyed or concealed, probable cause existed, and Dayvault was aware officers were investigating, the State met its burden to prove the applicability of the exception to the warrant requirement.

Under these circumstances, the warrantless seizure of Dayvault's cell phone was excused by the exception for probable cause plus exigent circumstances. The district court did not err when it denied Dayvault's motion to suppress the extensive evidence from his cell phone.

CONCLUSION

Dayvault's statements providing the officers with probable cause to seize his cell phone without a warrant were made during a noncustodial interview, and law enforcement officers had probable cause plus exigent circumstances to seize Dayvault's cell phone without a warrant. The district court's denial of Dayvault's motion to suppress is affirmed.

Affirmed.