No. 126,734

IN THE COURT OF APPEALS OF THE STATE OF KANSAS


STATE OF KANSAS,
*Appellee/Cross-appellant*,


v.


JESSE LYDELL HICKS,
*Appellant/Cross-appellee*.


SYLLABUS BY THE COURT


1.

*City of Wichita v. Molitor*, 301 Kan. 251, 263, 341 P.3d 1275 (2015), does not hold that horizontal gaze nystagmus (HGN) tests are never admissible in court or that law enforcement cannot use the HGN test as part of their independent investigation. The results will simply not be admitted into evidence or considered by the finder of fact in the calculus for reasonable suspicion absent expert testimony regarding their scientific validity. The officer may testify concerning the driver's ability to follow directions or other nonscientific observational evidence about the process of HGN testing if it is otherwise relevant.


2.

Because the HGN results *may* be admissible at trial if the prosecutor produces an expert concerning their scientific validity, conducting an HGN test does not unnecessarily prolong a traffic stop when the officer is investigating the driver's intoxication.


3.

The decision of the United States Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), was intended to apply to in-custody

interrogations at the police station or in situations when the suspect is deprived of their freedom in a significant way. The decision generally was not intended to apply to on-the-scene police questioning of a suspect in the initial fact-finding process.

4.

Routine stops differ from custodial detentions. Questioning a suspect at a traffic stop is generally permissible, in part because said stops often occur in public settings and on-scene questioning is necessary. In addition, most people know that a traffic stop is ordinarily brief, and that at the conclusion of the stop the motorist will be free to leave.

5.

Even if the officer intends to place a defendant into custody as soon as the driver steps from the vehicle following a traffic stop, it is irrelevant unless the officer communicates that plan to the driver. Unless a suspect has been subjected to restraints comparable to those associated with a formal arrest, the suspect need not be *Mirandized* before law enforcement can ask the suspect questions.

6.

The 30-day sentence enhancement required under K.S.A. 8-1567(c) must be assessed consecutive to any other minimum mandatory penalty imposed.

7.

The 30-day sentence enhancement required under K.S.A. 8-1567(c) may not be suspended to the terms of probation.

8.

"[O]ther conditional release" as used in K.S.A. 8-1567(c) means conditional release through the Kansas Department of Corrections, service of which is counted as jail time as outlined in K.S.A. 2022 Supp. 22-3722. It does not mean probation.

Appeal from Shawnee District Court; MABAN WRIGHT, judge. Oral argument held April 8, 2025. Opinion filed August 29, 2025. Convictions affirmed, sentence vacated, and case remanded with directions.

*Nicholas David*, of The David Law Office LLC, of Lawrence, for appellant/cross-appellee.

*Jodi Litfin*, deputy district attorney, *Michael F. Kagay*, district attorney, and *Kris W. Kobach*, attorney general, for appellee/cross-appellant.

Before CLINE, P.J., ARNOLD-BURGER and GARDNER, JJ.

ARNOLD-BURGER, J.: Jesse Lydell Hicks was charged with several crimes including driving under the influence of alcohol (DUI). Before his trial, Hicks unsuccessfully moved to suppress evidence related to his traffic stop. He was ultimately convicted of the DUI, endangering a child, and illegal registration. Hicks appeals the district court's denial of his motions to suppress evidence, arguing first that the officer unreasonably extended his traffic stop by performing a horizontal gaze nystagmus test (HGN). Next, he argues he endured a custodial interrogation without receiving a *Miranda* warning, requiring suppression of his admissions to drinking. See *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). After a thorough review of the record and law, we affirm the district court's denial of Hicks' motions to suppress.

Hicks was subsequently convicted of a third time misdemeanor DUI offense with a child under the age of 18 in the car. The district court sentenced Hicks to 12 months in jail but suspended it to 12 months of probation. The judge gave Hicks credit for the 3 days he had already served in jail, inclusive of the mandatory 48 hours required to be served prior to any release. He then ordered Hicks to serve 90 days on house arrest. The State cross-appealed this decision and argues the sentence imposed by the district court was illegal because under the enhanced sentence requirements of K.S.A. 8-1567(c), Hicks was required to receive a sentence enhancement of 30 days, consecutive to the 90-

day mandatory minimum. We agree that Hicks' sentence was contrary to the requirements of K.S.A. 8-1567(c); therefore, we vacate the sentence and remand for resentencing consistent with the statute.

FACTUAL AND PROCEDURAL HISTORY

We begin by reviewing the evidence established during the motion to suppress hearing and trial. We pause to note that the entire stop was captured on video and introduced at both the hearing and the trial, so the facts are not in dispute.

*The traffic stop*

On a winter evening in 2022, Trooper Connor Rule was driving down the highway when he approached a vehicle traveling in front of him under the posted speed limit. He ran the registration on the car and determined it was lost, which according to Trooper Rule meant that it did not belong to that car and could have meant the vehicle was stolen. After Trooper Rule moved behind the vehicle, the vehicle changed lanes in front of him. It then moved back into Trooper Rule's lane driving slowly and then changed lanes again. At this point, knowing that the car lacked proper registration, Trooper Rule first activated his patrol lights to pull the vehicle over. When the brakes on the car did not come on and the driver did not appear to react to the lights, Trooper Rule turned on his patrol car's siren. Hicks slowly pulled off the roadway before eventually coming to a complete stop.

Once at Hicks' driver's side door, Trooper Rule asked Hicks if he had a license on him, and Hicks seemed to suggest that his license was suspended, and he had to go to court "on the 5th." He was not able to produce a driver's license. It appeared that Hicks had difficulty pulling out some form of identification, and as this was happening Trooper Rule asked Hicks, "How much have you had to drink tonight man?" This was less than a

4

minute after Trooper Rule first appeared at Hicks' car door. Hicks mumbled and then responded, "I had a beer or two." Hicks gave Trooper Rule a Kansas ID card.

When Hicks exited his vehicle, Trooper Rule told him that he was going to make sure that he did not have any guns on him. He told Hicks that Hicks smelled like alcohol. Trooper Rule had Hicks turn around, and as he patted Hicks down, he looked inside the pockets of his coat. Trooper Rule told Hicks to stand back behind his car and wait there.

Trooper Rule again asked how many drinks Hicks had had, and Hicks told him that he had a couple. When Trooper Rule returned a couple of minutes later, he asked Hicks where he was coming from, and Hicks told him that he was coming from Kansas City.

Trooper Rule told Hicks he would run him through a couple of tests. Trooper Rule started with an HGN test where Trooper Rule had Hicks follow his finger with his eyes without moving his head. After this test, Trooper Rule instructed Hicks to walk in a straight line moving his right foot in front of left foot and staying steady. Hicks struggled with this test by not being able to successfully follow Trooper Rule's directions or keep his balance, indicating impairment. The next test Trooper Rule proposed to Hicks was a balance test, in which Hicks was instructed to stand on one leg and count. He was not able to complete that test successfully either. Hicks communicated that he had difficulty balancing.

Rather than conducting another physical test, Trooper Rule asked Hicks if he could count backwards from 69 to 47. Hicks said he could count and attempted the test. Hicks was not able to complete the test, randomly calling out numbers that were not in order. After the counting test, Trooper Rule returned to the vehicle to ask the passenger some questions about how much she had to drink. There was also a six-year-old child in the car. Trooper Hicks talked to the passenger to establish that she could get someone to

5

the location to pick her and the child up since she also was too intoxicated to drive. He then attempted to remove the tags from the car but did not succeed.

Next, Trooper Rule retrieved a preliminary breathalyzer device from his car and approached Hicks with it. Hicks had difficulty blowing into the device, and he told the officers he had COPD which inhibited his ability to breathe. But he eventually blew into the breathalyzer for long enough to provide a full reading on the device. After observing the reading, Trooper Rule handcuffed Hicks and explained how the vehicle was not registered, his passenger was drunk, and there was a child in the car. He took Hicks into his patrol car and, roughly 30 minutes after the stop, provided Hicks the implied consent advisory.

*Hicks' motions to suppress*

Before trial, Hicks twice moved to suppress evidence. In the first motion Hicks sought to suppress illegally seized evidence based upon Hicks' stop being unlawfully extended. His second motion was to suppress his statements because he claimed he was subjected to a custodial interrogation without a *Miranda* warning. The State opposed both motions.

Trooper Rule was the sole witness at the subsequent hearing on the motions. The court denied both motions, and we will provide additional details later in this opinion.

*Jury trial and sentencing*

The case was tried before a jury in 2023. The jury convicted Hicks of driving under the influence, endangering a child, and illegal registration. He was acquitted of driving while suspended and a child passenger restraint violation.

At sentencing, Hicks challenged the presentence investigation report. He argued that his DUI conviction should be a third and not a fourth conviction. The district court agreed with Hicks, and it found Hicks had two previous convictions for a DUI or comparable driving while intoxicated offense and he should be sentenced for his third DUI. That decision is not contested here.

The judge sentenced Hicks under the statute with regards to a basic third time misdemeanor DUI. He was sentenced to one year in jail. He was given credit for 3 days served and then released to 90 days on house arrest. The balance of the jail term was suspended to a one-year supervised probation term. See K.S.A. 8-1567. But because Hicks had a child under the age of 18 in the car, the statute required a 30-day sentence enhancement. K.S.A. 8-1567(c). The court did not address the required enhancement, except to say that it would "suspend the period of incarceration after 90 days and place him on conditional release. And in this case that will be probation." The State filed a motion to correct an illegal sentence arguing that to comply with the 30-day enhancement required by K.S.A. 8-1567(c), Hicks' sentence must be 120 days on house arrest, rather than 90. Hicks responded by arguing that his "sentence is lawful because parole [*sic*] is a form of 'conditional release' which is expressly authorized by K.S.A. 2018 Supp. 8-1567(c)." The district court denied the State's motion.

Hicks timely appeals his convictions based on the denial of his motions to suppress, and the State has filed a cross-appeal arguing that Hicks' sentence is illegal.

ANALYSIS

I.    THE DISTRICT COURT DID NOT ERR IN DENYING HICKS' MOTION TO SUPPRESS

When the State opposes a motion to suppress evidence, it bears the burden of proof that the search and any ultimate seizure were lawful. *State v. Regelman*, 309 Kan.

7

52, 58, 430 P.3d 946 (2018). Kansas appellate courts review a district court's decision on a motion to suppress in two steps. First, this court reviews the district court's factual findings to determine whether they are supported by substantial, competent evidence, which is legal and relevant evidence that a reasonable person would find sufficient to support a conclusion. Second, this court looks at the district court's ultimate legal conclusions de novo—without reweighing evidence, assessing the credibility of witnesses, or resolving conflicts in the evidence. If the facts are not disputed, the district court's decision to grant or deny a suppression motion presents a question of law which this court has unlimited review over. *State v. Guein*, 309 Kan. 1245, 1251-52, 444 P.3d 340 (2019).

Here, Hicks raises two distinct suppression-based arguments. First, he claims Trooper Rule unlawfully extended his traffic stop. Second, Hicks argues his statements at the stop regarding his consumption of alcohol were inadmissible because the encounter was a custodial investigation and he was not first apprised of his *Miranda* warning. We consider each in turn.

     A. *Trooper Rule had reasonable suspicion to investigate a potential DUI and did not prolong the stop by asking Hicks to perform the HGN test.*

The Fourth and Fourteenth Amendments to the United States Constitution prohibit unreasonable seizures and searches. *State v. DeMarco*, 263 Kan. 727, 733, 952 P.2d 1276 (1998). A routine traffic stop is a seizure under the Fourth Amendment. *State v. Jimenez*, 308 Kan. 315, 322, 420 P.3d 464 (2018). "The scope and duration of seizure must be strictly tied to and justified by the circumstances which rendered its initiation proper. *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)." *State v. Damm*, 246 Kan. 220, 224, 787 P.2d 1185 (1990). "'An investigative detention must last no longer than is necessary to effectuate the purpose of the stop.'" *DeMarco*, 263 Kan. at 734.

8

"To extend a traffic stop beyond the time necessary to address the traffic violation, an officer must have a reasonable suspicion to believe that the person was or is involved in additional criminal activity. Reasonable suspicion requires more than just a hunch; the officer must be able to state a particularized and objective basis for believing the person stopped is engaged in criminal activity. [Citations omitted.]" *Strickert v. Kansas Dept. of Revenue*, 58 Kan. App. 2d 1, 7-8, 462 P.3d 649 (2020).

In this case, the legality of the initial stop is undisputed because Trooper Rule lawfully stopped Hicks for a registration violation. Rather, what is disputed is whether Trooper Rule had reasonable suspicion to extend that stop to include an investigation of a DUI. Hicks contends his traffic stop seizure was unlawfully extended because conducting an HGN test is not a permissible means of investigation for Trooper Rule to use to confirm or deny his suspicions.

Hicks insists that because Trooper Rule's initial intent to pull him over was based on vehicle registration, Trooper Rule's requirement that Hicks remain and perform the HGN was reasonably calculated to confirm or dispel his suspicions that Hicks was driving under the influence. Put another way, Hicks argues because results of HGN testing are inadmissible for any purpose, the extension of the traffic stop to perform it was impermissible.

We first examine the evidence.

Trooper Rule testified that he relied on the following to establish reasonable suspicion that Hicks had been drinking.

1. Hicks was driving under the speed limit, and drunk drivers sometimes drive below the speed limit;
2. Hicks' unnecessary lane changes were odd, though not illegal;
3. Hicks' failure to respond to the officer's flashing lights;

9

4. Hicks' slowness in exiting the roadway could suggest intoxication or that he was hiding or grabbing something in the car;

5. The radio was blaring, which he testified is also common among drunk drivers;

6. He immediately detected the smell of alcohol on Hicks' breath; and

7. Hicks' eyes were bloodshot and watery, and his speech was slurred. "[T]he way he was talking sounded like a drunk person to me."

Trooper Rule testified that he administered an HGN test, which is part of the normal protocol for a DUI investigation. He looks for clues affirming or denying his suspicion that Hicks was driving under the influence, although there was no testimony concerning the results of the HGN test. Then he administered the walk-and-turn test, a one-leg stand test, and a counting backwards test, all three of which Hicks failed. Trooper Rule testified the investigation was completed after Hicks blew into the breathalyzer for a preliminary breath test (PBT).

Trooper Rule testified, "I always do HGN, walk and turn, and one leg stand." And he does all three of these tests in that order. It does not matter that Trooper Rule first did the HGN test then a different test because the whole process was an investigative search into whether Hicks had driven under the influence. And at the time Trooper Rule began to administer the field sobriety tests he had already articulated his reasonable suspicion that Hicks had been drinking—i.e., unnecessary lane changes, watery eyes, and he smelled alcohol, etc.

So in short, Trooper Rule clearly had reasonable suspicion to investigate Hicks for DUI. And as part of this investigation, and pursuant to his protocol, he was performing the HGN test, the walk-and-turn test, the one-leg stand test, the counting test, and a PBT. It is irrelevant whether the results of any of these tests would have been admissible at trial or what order they were given in.

Hicks correctly points out that HGN testing results are generally not admissible and the Kansas Supreme Court has in fact stated that an "HGN test has no more credibility than a Ouija Board or a Magic 8 ball." *City of Wichita v. Molitor*, 301 Kan. 251, 263, 341 P.3d 1275 (2015). Yet, Hicks fails to explain how the totality of the circumstances shows this was an impermissible extension of a traffic stop.

In *Molitor*, upon which Hicks relies, our Supreme Court held consistent with its opinion in *State v. Witte*, 251 Kan. 313, 330, 836 P.2d 1110 (1992), absent expert testimony, the results of HGN tests are not admissible in court nor can their results be used to support the requisite reasonable suspicion to request a breath test. 301 Kan. at 262-63. *Molitor* does not hold that HGN tests are never admissible in court or that law enforcement cannot use the HGN test as part of their independent investigation. The results will simply not be admitted into evidence or considered by the finder of fact in the calculus for reasonable suspicion absent expert testimony regarding their scientific validity.

Here, neither the *results* of the HGN test nor any observations made during the HGN test were provided to the court or the jury. In fact, even the portion of the on-scene video of the HGN test being performed was redacted before submission to the jury. The determination of reasonable suspicion was made without any consideration of the results. The mere fact that the officer performed the test does not indicate an unreasonable extension of the stop. And, contrary to Hicks' argument, the performance of the HGN test does not taint the whole investigation from the point the test was used onward. We do not engage in assessing each piece of evidence in isolation but must look at the interaction of all the evidence. 301 Kan. at 266.

Moreover, "[w]hile the results of [HGN] tests are not admissible in Kansas courts for any purpose unless a proper foundation for their scientific validity is made, evidence about the process of testing may be introduced if it is otherwise relevant." *City of*

*Leawood v. Puccinelli*, 56 Kan. App. 2d 108, Syl. ¶ 4, 424 P.3d 560 (2018). For example, the officer may testify concerning the driver's ability to follow directions or other observational evidence about the process of testing if it is otherwise relevant. Because the results may be admissible at trial based on whether the prosecutor produces an expert concerning their scientific validity, conducting an HGN test does not unnecessarily prolong a traffic stop when the officer is investigating the driver's intoxication.

Trooper Rule had more than just a hunch here. And reasonable suspicion requires more than just a hunch. See *Strickert*, 58 Kan. App. 2d at 7-8. Trooper Rule articulated his reasons for suspicion of impairment before the HGN test—which included unnecessary lane changes, slow rolling, smelling alcohol, watery eyes, and Hicks appearing like a drunk person. He had an objective basis for the stop which was to investigate the fact that the registration tag was reported lost. And when Trooper Rule gathered the requisite reasonable suspicion that another crime was being committed, driving while under the influence, he was permitted to conduct his investigation.

Under the totality of the circumstances, Trooper Rule did not unlawfully extend the traffic stop. Instead, he merely investigated criminal activity. And his reasonable suspicion for the DUI investigation was not in any way displaced by the HGN test. The remaining field sobriety tests were an extension of this reasonable suspicion. So we have no trouble finding that the court's factual findings were supported by substantial, competent evidence and the court's ultimate legal conclusions supported the denial of Hicks' motion to suppress.

B. *Trooper Rule's questioning of Hicks was not the result of a custodial interrogation.*

"Statements made during a custodial interrogation must be excluded under the Fifth Amendment to the United States Constitution unless the State demonstrates it used

procedural safeguards, i.e., *Miranda* warnings, to secure the defendant's privilege against self-incrimination." *State v. Parker*, 311 Kan. 255, 257, 459 P.3d 793 (2020). Whether someone has been unreasonably seized under the Fourth Amendment differs from whether someone was "'in custody'" under *Miranda*. *Guein*, 309 Kan. at 1253.

> "A custodial interrogation is defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his or her freedom in any significant way. A custodial interrogation is distinguished from an investigatory interrogation, which occurs as a routine part of the fact-finding process before the investigation reaches the accusatory stage. [Citations omitted.]" 309 Kan. at 1253-54.

That said, *Miranda* warnings are generally not required during a routine traffic stop because most people know that a traffic stop is ordinarily brief, and that at the conclusion of the stop the motorist will be free to leave. *Berkemer v. McCarty,* 468 U.S. 420, 437, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984). Moreover, even if the officer intends to place a defendant into custody as soon as the driver steps from the vehicle following a traffic stop, it is irrelevant unless the officer communicates that plan to the driver. Unless a suspect has been "subjected to restraints comparable to those associated with a formal arrest," the suspect need not be *Mirandized* before law enforcement can ask the suspect questions. 468 U.S. at 441-42.

And this makes sense. Even the *Miranda* Court made it clear that its decision was intended to apply to in-custody interrogations at the police station or in situations when the suspect is deprived of their freedom in a significant way. The decision generally was not intended to apply to on-the-scene police questioning of a suspect in the initial fact-finding process. *Miranda*, 384 U.S. at 477-78. Indeed, *Terry* stops differ from custodial detentions, and questioning a suspect at a traffic stop is permissible. In part this is because *Terry* stops often occur in public settings and on-scene questioning is necessary. 3 Ringel, Searches & Seizures, Arrests and Confessions § 27:7 (2d ed. 2025); see also

13

3 Ringel, Searches & Seizures § 27:7 n.16 ("Defendant charged with driving while intoxicated was not in custody for *Miranda* purposes at the time of his inculpatory statement during a traffic stop, in which he admitted that he had been drinking, where the officer was merely investigating a suspicion that the defendant was driving while intoxicated.") (citing *State v. Evans*, 130 So. 3d 406 [La. Ct. App. 2d Cir. 2013]).

When Hicks was slow to stop, coupled with the belief that the car could be stolen, Trooper Rule made a traffic stop that began in a very aggressive manner. Before approaching the car, he shouted commands at Hicks ordering him to put his hands out the window. Hicks then approached the car with his gun drawn to his side. It was this show of force, Hicks argues, that made this stop custodial, requiring any statements made during the stop to be suppressed absent *Miranda* warnings.

The district court rejected Hicks' argument explaining, "there was no show of force. Trooper Rule explained that due to Hicks' actions, he had drawn his weapon, but did not point the gun at Hicks, and seconds later placed his gun back in his holster." The court continued and explained how Trooper Rule testified why he yelled when he first approached Hicks, and the camera footage ultimately showed Trooper Rule speaking calmly to Hicks. Thus, the court held that considering all the factors related to the stop and questioning of Hicks, the investigation was not custodial when Trooper Rule spoke to Hicks about drinking.

We agree. Trooper Rule's actions did not amount to converting this investigatory encounter to the level of a custodial interrogation. A clear demonstration of authority by law enforcement is not enough to trigger a requirement to advise a driver of their rights under *Miranda*. Trooper Rule testified that given Hicks' actions and the fact that the car could be stolen, his primary concern at that stage was officer safety. As soon as Trooper Rule determined it was safe to approach, he did so. This determination according to the video and to Trooper Rule's testimony was just a few seconds. In an investigatory

detention, law enforcement officers are "authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235, 105 S. Ct. 675, 83 L. Ed. 2d 604 (1985).

As he approached Hicks' vehicle, Trooper Rule repeatedly told Hicks: "Lights and siren come on, means pull-over, right?" Hicks told Trooper Rule, "I was just trying to get over," but Trooper Rule told him that he was "taking forever to stop man." Trooper Rule asked if he had a license on him, and Hicks responded that he had to go to court "on the 5th." Then Trooper Rule pointed out that his tag for his car came up as lost to which Hicks responded by saying, "Lost?" Even on the video Hicks is having trouble understanding what is happening and speaking clearly. Trooper Rule then asked Hicks, "How much have you had to drink tonight man?" Hicks mumbled and then responded, "I had a beer or two." Trooper Rule asked if Hicks had a Kansas ID or something similar. Hicks mumbled back to Trooper Rule. Trooper Rule told him to take his seat belt off and exit the car.

When Hicks exited his vehicle, on his own, Trooper Rule told him that he was going to make sure that he did not have any guns on him and told him that he smelled like alcohol. Trooper Rule had Hicks turn around, and the trooper patted down Hicks and looked inside the pockets of his coat. Trooper Rule told Hicks to stand back behind his car and wait there. And Hicks just stood there calmly, trying to talk with the other officer. Trooper Rule again asked how many drinks Hicks had, and Hicks told him that he had a couple. That was the extent of the questioning.

Trooper Rule returned to the patrol car, and Hicks waited at the front of the car and appeared to be casually talking with the other police officer present, who took no role in the case other than to stand by as potential backup if needed.

15

As the Court stated in *Miranda*:

> "Our decision is not intended to hamper the traditional function of police officers in investigating crime. . . . General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. . . . In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present. [Citation omitted.]" 384 U.S. at 477-78.

Likewise, in *State v. Vanek*, 39 Kan. App. 2d 529, Syl. ¶ 7, 180 P.3d 1087 (2008), a panel of this court noted:

> "During a lawful traffic stop, a law enforcement officer is not required to *Mirandize* an individual before asking routine investigatory questions where the individual is not in legal custody or deprived of his or her freedom in any significant way. This is true even though the officer suspects the individual may have committed a crime, and even though the individual is not free to leave during the lawful detention."

Under the totality of the circumstances here, Trooper Rule conducted investigatory questioning permissible at a traffic stop when the officer has reasonable suspicion that a crime has been committed. Both the facts and the law support the district court's decision to deny Hicks' motion to suppress.

## II.  HICKS' SENTENCE WAS ILLEGAL

On cross-appeal, the State argues that Hicks' sentence was illegal because it misapplied the enhanced penalty provision under K.S.A. 8-1567(c) by failing to add 30 days to his mandatory minimum sentence and incongruently releasing Hicks to probation on the unassessed additional 30 days required by the statute instead of imposing imprisonment, work release, or house arrest.

A. *Our standard of review is unlimited.*

Whether a sentence is illegal within the meaning of K.S.A. 22-3504 is a question of law over which the appellate court has unlimited review. *State v. Mitchell*, 315 Kan. 156, 158, 505 P.3d 739 (2022). An illegal sentence is defined as a sentence that (1) is imposed by a court without jurisdiction; (2) does not conform to the applicable statutory provisions, either in character or the term of punishment; or (3) is ambiguous about the time and manner in which it is to be served. K.S.A. 22-3504(c)(1). A court may correct an illegal sentence at any time while the defendant is serving the sentence. K.S.A. 22-3504(a).

To determine whether a sentence conforms to applicable statutory provisions, we engage in statutory interpretation. Such interpretation presents a question of law over which appellate courts have unlimited review. *State v. Betts*, 316 Kan. 191, 197, 514 P.3d 341 (2022).

B. *The general rules regarding divining legislative intent are examined.*

The most fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be ascertained. First, we try to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind that clear language, and it should refrain from reading something into the statute that is not readily found in its words. *State v. Keys*, 315 Kan. 690, 698, 510 P.3d 706 (2022). Only if the statute's language or text is unclear or ambiguous does the court use canons of construction or legislative history to construe the Legislature's intent. *Betts*, 316 Kan. at 198.

17

C. *Hicks is sentenced.*

We pause to examine which sentencing statute applies to Hicks' case. The Kansas DUI statute, K.S.A. 8-1567, is probably the most amended statute in the history of Kansas, with an amendment happening occasionally every few years, often every year, and several times multiple times in the same year. So which statute applies, as well as which provisions were changed and why, is often difficult to determine, but it is essential to understanding what happened here.

Hicks committed this crime in February 2022. The DUI law in effect at the time was the version that became effective July 1, 2018. K.S.A. 2018 Supp. 8-1567; see L. 2018, ch. 106, § 13. There was not another change in the law until July 2022. See L. 2022, ch. 80, § 14. This was the version of the DUI law that was in effect at the time Hicks was sentenced. K.S.A. 8-1567.

When Hicks committed his crime, third time misdemeanor DUI offenders were subjected to a maximum 1 year in jail and a minimum 90 days in jail. The person was required to serve a minimum of 90 days in jail, but the 90 days could be served by 48 consecutive hours of imprisonment followed by 2,160 hours of house arrest or work release. We note that 2,160 hours would be the equivalent of 90, 24-hour days. K.S.A. 2018 Supp. 8-1567(b)(1)(C).

In 2022, the Legislature changed the penalty provision, still requiring a maximum of 1 year and a mandatory minimum of 90 days' imprisonment, but after 48 consecutive hours of imprisonment, the person was only required to do 28 days on work release or house arrest before being released on 1 year of postincarceration supervision. K.S.A. 8-1567(b)(1)(C), (b)(3).

18

However, both versions of the statute required that the mandatory minimum sentence be enhanced by one month if a child under the age of 18 is in the car at the time of the offense. The enhancement provision also provides:

> "This imprisonment must be served consecutively to any other minimum mandatory penalty imposed for a violation of this section or an ordinance which prohibits the acts that this section prohibits. Any enhanced penalty imposed shall not exceed the maximum sentence allowable by law. During the service of the enhanced penalty, the judge may order the person on house arrest, work release or other conditional release." K.S.A. 8-1567(c).

At sentencing, the district court asked the parties if they agreed that the 2018 version of the statute would be the version that applied to Hicks' sentence and they both agreed. Since Hicks had already served 3 days in jail, the court ordered Hicks to serve 90 days on house arrest. Hicks' counsel then took up the issue of the 30 additional days (or one month) required under K.S.A. 8-1567(c). Hicks' counsel asked the court to impose the additional 30 days, for a total minimum sentence of 120 days, but to place Hicks on probation on all 30 days. In other words, he asked the court not to require any additional house arrest for the mandatory enhancement under the theory that "conditional release" means the same as probation. The State agreed that the mandatory minimum needed to be 120 days but argued that the 30 days was required to be served on house arrest as well. The district court sentenced Hicks to a minimum of 90 days and a maximum of 1 year and ordered him to serve 90 days on house arrest before being released on probation. The court made no order regarding the 30-day sentence enhancement and clearly did not impose the 120-day mandatory minimum sentence that both parties agreed was required.

The State filed a motion to correct an illegal sentence since the court had not ordered an additional 30 days to be served on house arrest. The State argued that based on the plain language of K.S.A. 8-1567(c), Hicks was required to have a mandatory minimum sentence of 120 days and the additional 30 days had to be served in jail, on

19

work release, or on house arrest. Hicks responded that the sentence was legal. He asserted that because the court assessed a maximum sentence of 1 year, the additional 30 days was inherently included in the total and the plain language of the statute allowed the court to release him on probation on those 30 days, just as he was released on probation for the rest of the sentence. "Conditional release," he argued, was the same as probation. The district court agreed. The court found that since conditional release meant the same as probation and Hicks could be placed on probation for the 30 days, his total sentence of 1 year was sufficient to cover those additional 30 days. We are not able to locate any new sentencing journal entry in the record on appeal. It appears the district court simply affirmed its prior order, sentencing Hicks to 1 year in jail, and releasing him on probation after 90 days of house arrest.

D. *The DUI sentencing provisions in effect at the time of sentencing apply.*

In *State v. Reese*, 300 Kan. 650, 657, 333 P.3d 149 (2014), the Kansas Supreme Court held that the DUI sentencing provisions in effect at the time of sentencing apply, even if those provisions were not yet in effect when the defendant had committed the offense. It subsequently modified this rule to avoid any claim under the Ex Post Facto Clause of Article I, Section 10 of the United States Constitution.

> "We hold that a sentencing court should apply the version of K.S.A. 8-1567 in effect at the time of sentencing *unless* the Legislature amended the statutory provisions after the offense was committed *and* that amendment increases the defendant's penalty. In those circumstances, applying the intervening change in the law, relying on *Reese*, would violate the Ex Post Facto Clause of article I, section 10 of the United States Constitution. To avoid this constitutional quandary, sentencing courts should instead apply the version of K.S.A. 8-1567 in effect when the defendant committed the DUI offense." *State v. Patton*, 315 Kan. 1, 3, 503 P.3d 1022 (2022).

So, K.S.A. 8-1567 was the version of the DUI statute that the court was required to follow in sentencing Hicks.

  E. *Hicks' sentence for the DUI, absent the enhancement, was legal under both K.S.A. 2018 Supp. 8-1567(b)(1)(C) and K.S.A. 8-1567(b)(1)(C).*

Both the 2018 and the 2022 versions of the third time misdemeanor DUI penalties require a minimum sentence of 90 days and a maximum of 1 year. Even though the amount of time that is required to be served on house arrest or work release before release from custody varies, the sentence imposed here of 1 year in jail and 90 days' house arrest was well within the statute and is not illegal. And no one argued now or then that it was.

For the first time on appeal, Hicks argues that he should have been sentenced under the 2022 version of the statute and therefore only given 28 days on house arrest. But he did not make that argument before the district court. And even now he does not argue that his overall sentence was illegal or even unclear. He doubles down on his argument before the district court that the one-month sentence enhancement is allowed to be served on probation and because probation was appropriate, his overarching sentence was legal. He does not argue that the mere fact that he was given 90 days' house arrest instead of 28 days makes his sentence illegal. To the contrary, he has always argued his sentence is legal regardless of whether he ultimately believes he received a longer house arrest term than was required under K.S.A. 8-1567(b)(1)(C).

  F. *By failing to impose the one-month sentence enhancement under K.S.A. 8-1567(c) and by failing to require that it be served in jail, on house arrest, or on work release, Hicks' sentence was illegal and must be vacated.*

But this does not end our inquiry. Because subsection (c) is the same under both the 2018 and the 2022 version of the statute, the issue of whether Hicks' sentence was legal with regards to the application of subsection (c) remains the same.

21

We reiterate, as applicable here, that an illegal sentence is defined as a sentence that either does not conform to the applicable statutory provisions, either in character or the term of punishment; or is ambiguous about the time and manner in which it is to be served. K.S.A. 22-3504(c)(1). We believe both apply to the district court's interpretation of K.S.A. 8-1567(c).

When an adult offender has children under the age of 18 in the car at the time of their DUI offense, their punishment is enhanced by one month of imprisonment.

"(c) Any person 18 years of age or older convicted of violating this section or an ordinance which prohibits the acts that this section prohibits who had one or more children under the age of 18 years in the vehicle at the time of the offense shall have such person's punishment enhanced by one month of imprisonment. This imprisonment must be served consecutively to any other minimum mandatory penalty imposed for a violation of this section or an ordinance which prohibits the acts that this section prohibits. Any enhanced penalty imposed shall not exceed the maximum sentence allowable by law. During the *service* of the enhanced penalty, the judge may order the person on house arrest, work release or other conditional release." (Emphasis added.) K.S.A. 8-1567(c).

The district court identified the issue as a singular one, whether a defendant could be placed on probation for the mandatory 30-day sentencing enhancement required by K.S.A. 8-1567(c). In other words, what is meant by the term conditional release? If it includes probation, then not requiring that the additional 30 days be served on house arrest or work release but instead be suspended to the terms of a probation was a legal sentence—it conformed to the statutory provision. If the terms probation and conditional release are distinct and different, and probation is not a form of conditional release, then the sentence is illegal.

But there is also a second issue here. The mandatory minimum for a third time offender such as Hicks is 90 days. So the additional question is whether the 30-day

22

sentence enhancement must be added to the 90 days to make a total mandatory minimum sentence of 120 days, no matter how much is allowed to be served on house arrest, work release, or probation. We will address the later question first.

i. *K.S.A. 8-1567(c) requires that the 30-day enhancement be added to the mandatory minimum sentence.*

The enhanced penalty provision at issue is clear and unambiguous. "This imprisonment must be served consecutively to any other minimum mandatory penalty imposed." K.S.A. 8-1567(c). The mandatory minimum sentence for a third time DUI offender is 90 days' imprisonment. Therefore, the 30 days must be added to the 90-day minimum for a total of 120 days. At the same time, "[a]ny enhanced penalty imposed shall not exceed the maximum sentence allowable by law." K.S.A. 8-1567(c). Hicks was required to be sentenced to a minimum of 120 days and a maximum of 1 year. He was sentenced to a minimum of 90 days according to both the journal entry and the oral pronouncements at sentencing, so Hicks' sentence was illegal. This is true whether the district court intentionally failed to include the additional 30 days requested at the time by both parties for a minimum of 120 days, or if its order is simply unclear.

ii. *You cannot serve a sentence on probation. The terms are mutually exclusive.*

So the next question is whether Hicks must serve the 30-day enhancement in jail or if he can serve all or a portion of it on house arrest or work release, or if he does not have to serve it at all and can instead have the 30 days suspended to the terms of probation.

Under the plain language of the statute, if Hicks has a child under the age of 18 in the car, he must have his "punishment enhanced by one month of imprisonment. This imprisonment must be *served . . . .*" (Emphasis added.) K.S.A. 8-1567(c). We know

23

probation is not part of the sentence. It is a dispositional alternative to serving a sentence and does not increase or decrease the sentence required to be imposed by statute. A person on probation is not serving a sentence. *State v. Carr*, 274 Kan. 442, 451, 53 P.3d 843 (2002). Accordingly based on the plain language of the statute, granting Hicks probation on the mandatory 30-day enhancement would be illegal because he would not be *serving* the sentence.

> iii. *"Probation" and "conditional release" as used in K.S.A. 8-1567 are not the same thing.*

But the statute does allow a defendant to *serve* the sentence on house arrest, work release, and "other conditional release." K.S.A. 8-1567(c) ("During the *service* of the enhanced penalty, the judge may order the person on house arrest, work release or other conditional release." [Emphasis added.]). The district court found that "other conditional release" is the same as probation. We disagree.

First, the terms are used separately, and we must assume purposefully, within the statute.

The term "probation" is referred to six times, although never specifically defined. The statute first sets out the minimum and maximum terms of imprisonment for each level of offense, first, second, third with the priors more than 10 years old, third with the priors less than 10 years old, and fourth or subsequent. In each of these four severity levels, the statute notes that as a condition of probation the person shall serve a given number of hours of confinement. For example, the provision Hicks was sentenced under, K.S.A. 8-1567(b)(1)(C)(i), states:

> "As a condition of any probation granted under this subsection, the person shall serve at least 30 days of confinement. After at least 48 consecutive hours of *imprisonment*, *the remainder of the period of confinement* may be served by a combination of:

24

*Imprisonment*; a work release program, if such work release program requires such

person to return to the confinement at the end of each day in the work release program; or

a house arrest program pursuant to K.S.A. 2022 Supp. 21-6609[.]" (Emphasis added.)

Unlike the penalty provisions based on severity level of the offense, the enhancement subsection says nothing about the 30 days being a condition of probation. If the Legislature had meant for the 30 days to be spent on probation, it could have easily used that term as it does six other times in the statute.

Second, unlike the proviso in the penalty section that requires 48 hours' imprisonment before being released on work release or house arrest, the person is allowed *to serve* the entire enhanced 30 days on house arrest, work release, *or other conditional release*. We have already noted that you do not serve a sentence on probation.

So if conditional release does not mean probation, what does it mean?

Subsection (c) is the first and only mention of conditional release in K.S.A. 8-1567, and the term is not defined therein. "Kansas' DUI law is a self-contained criminal statute, which means that all essential components of the crime, including the elements, severity levels, and applicable sentences, are included within the statute." *Reese*, 300 Kan. at 654. It is also a habitual criminal statute because it imposes progressively enhanced sentences for repeat offenders such as Hicks. 300 Kan. at 654.

But even if the statute is self-contained, when a statute's meaning is not evident from its plain language, "we move from interpretation to construction, employing study of legislative history, application of canons of statutory construction, and appraisal of other background constructions." *State v. Raschke*, 289 Kan. 911, 914, 219 P.3d 481 (2009). And just as the plain meaning of words matter, context also matters. See *State ex*

*rel. Kobach v. Harper*, 65 Kan. App. 2d 680, 704, 571 P.3d 6 (2025), *petition for rev. filed* July 14, 2025.

Here the statutory construction doctrine of *noscitur a sociis* is helpful. This commonsense aid to the construction of statutes means "'it is known from its associates.'" *Jones v. Kansas State University*, 279 Kan. 128, 150, 106 P.3d 10 (2005).

> "This doctrine may be applied when the meaning of a word or phrase might be obscure or doubtful when considered in isolation to clarify or ascertain by reference to those words or phrases with which it is associated. When taken in context, a word may have a broader or narrower meaning than it might have if used alone." 279 Kan. at 150.

Here the term conditional release is used as follows: "During the *service* of the *enhanced penalty*, the judge may order the person on house arrest, work release *or other conditional release*." (Emphases added.) K.S.A. 8-1567(c). House arrest and work release, as discussed earlier, are situations in which a defendant is given credit for the time *served* on such programs toward their period of mandatory incarceration. So conditional release must mean some sort of release for which jail credit for time served can be given, because the statute clearly requires the 30 days to be *served*.

This leads us to our next rule of statutory construction.

When trying to determine legislative intent, we consider other statutes around it, related to it, or adopted at the same time to try to reconcile them and understand the context under which the words were chosen. See *Roe v. Phillips County Hospital*, 317 Kan. 1, 5-6, 522 P.3d 277 (2023). We do this because we assume the "Legislature acts with full knowledge of the subject matter, including prior and existing law and judicial decisions." *In re M.M.*, 312 Kan. 872, 875, 482 P.3d 583 (2021).

26

As the State points out, the Legislature has defined conditional release elsewhere. It is defined in the Kansas Code of Criminal Procedure, under Article 37, Release Procedures. It refers to an inmate's release subject to written rules and conditions imposed by the Kansas Prisoner Review Board once the prisoner has served their sentence minus any good time credits or work release credits, but before they have served their entire sentence. K.S.A. 22-3718; see *State v. Arculeo*, 261 Kan. 286, Syl. ¶ 2, 933 P.2d 122 (1997) (similarly defining conditional release); see also K.S.A. 21-6606(b) (terms probation, parole, community corrections assignment, and conditional release all used separately in same sentence); K.S.A. 21-6820(b) (appellate court may place a defendant on conditional release pending review of sentence).

But more importantly here, the statutes further provide that time on conditional release shall be deemed service of the term of confinement. K.S.A. 2022 Supp. 22-3722. It is served until the prisoner reaches their actual discharge date. It is the benefit one gets from accumulating work release and good behavior credits. Violation of conditional release will require that the inmate return to custody until their discharge date.

So why would the Legislature use a term related to conditions imposed by a prisoner review board on DUI offenders under K.S.A. 8-1567? The answer is simple. Some third and all fourth and subsequent DUI offenders are felons and can be housed in the state correctional system, subject to all its rules. See K.S.A. 8-1567(b)(2). The use of the term simply folds that process into habitual DUI offender penalties.

An examination of when this provision was first placed in the DUI law is enlightening. In 1992, "'[i]mprisonment' mean[t] imprisonment in a facility operated by the Kansas department of corrections," not a local jail. *State v. Scherzer*, 254 Kan. 926, 934, 869 P.2d 729 (1994). In 1993, for the first time, a third or subsequent DUI became a felony. L. 1993, ch. 259, § 8. So use of the term imprisonment would mean that felony DUI offenders must be sent to the department of corrections, to wit:  prison. Perhaps to

avoid that result, at the same time the Legislature adopted a specific definition for imprisonment in K.S.A. 8-1567, that remains today. "'[I]mprisonment' includes any restrained environment in which the court and law enforcement agency intend to retain custody and control of a defendant and such environment has been approved by the board of county commissioners or the governing body of a city." K.S.A. 8-1567(p)(2). So felony DUI offenders could be placed in local jails.

But in case this was not clear, in 1994, K.S.A. 21-4704 was amended to clarify that any violation of the felony provisions of K.S.A. 8-1567 would *not* be served in a state facility. L. 1994, ch. 341, § 1.

In 2001, K.S.A. 8-1567 (Furse 2001) was amended again by establishing that a fourth or subsequent DUI offender was to go into the custody of the department of corrections after serving mandatory jail time in order to complete inpatient or outpatient treatment. After completion of their mandatory jail time and their treatment, the offenders were to be placed on one year of postrelease supervision and complete an aftercare plan as determined by the Kansas Parole Board as a condition of release. Violations of the conditions of release could involve returning to prison but would involve a hearing before the parole board. See K.S.A. 2001 Supp. 75-5217(b), (e). This is the same year the enhanced penalty provision was adopted for persons who had a child in the car with them, and thus the first appearance of the term "conditional release" as it relates to the enhancement. K.S.A. 8-1567(h) (Furse 2001); L. 2001, ch. 200, § 14.

In 2007, the Legislature adopted the same provisions for felony third time offenders. L. 2007, ch. 181, § 9.

This history makes it clear that the "other conditional release" provisions means conditional release through the department of corrections that is counted as jail time for felony DUI offenders. The provisions of K.S.A. 8-1567, although generally self-

contained, have long been symbiotic with the felony imprisonment rules related to imprisonment under the supervision of the department of corrections and must be read in *in pari materia.* See *State v. Strong*, 317 Kan. 197, 203, 527 P.3d 548 (2023) (noting that when construing statutes to determine legislative intent, appellate courts must consider various provisions of an act *in pari materia* to reconcile and bring the provisions into workable harmony if possible); *State v. Castillo*, 54 Kan. App. 2d 217, 225-26, 397 P.3d 1248 (2017) (discussing the historical changes to the DUI statute as it relates to postrelease supervision and the interplay between K.S.A. 8-1567, K.S.A. 22-3717, and K.S.A. 75-5217 et seq.). Although the many changes over the years, even after 2001, related to how felony DUI offenders are treated and where they are housed may make imposing conditional release more remote, the term remains in the statute. There is nothing to suggest that its meaning has changed.

Hicks now argues that even if the State's interpretation of the application of the 30-day enhancement is correct, his sentence of 3 days incarcerated followed by 90 days' house arrest, met the mandatory minimums. In other words, he received the additional 30 days required for having a child in the car with him. If you add the enhanced 30 days, that would mean 58 days' house arrest, and he was given 90 days of house arrest. This appears to be a "no harm no foul" theory. We do not find this persuasive.

Regardless of whether the district court's sentence *would* have been legal under K.S.A. 8-1567—if we assume the judge assessed the 30 days of house arrest as required by the enhancement provision in subsection (c)—the judge did not explicitly enhance Hicks' sentence by 30 days as required by the statute. So at a minimum the sentence was ambiguous.

In sum, the district court erred by not expressly imposing the 30-day enhancement under K.S.A. 8-1567(c) consecutive to the 90-day mandatory minimum sentence it did impose. Under these facts and applying K.S.A. 8-1567(c), Hicks should have been

sentenced, *at a minimum*, to 120 days' imprisonment with a minimum of 60 days on house arrest (minus the 48 hours or more of actual imprisonment). We note that the court's assessment of the one-year term of mandatory postincarceration supervision for a third time misdemeanor DUI conviction was proper. K.S.A. 8-1567(b)(3).

Hicks' sentence is vacated, and the case is remanded for resentencing consistent with the applicable statute and this opinion.

III.    HICKS FAILED TO PRESERVE HIS NEW CLAIM THAT THE 30-DAY ENHANCEMENT SHOULD BE VACATED BASED ON A VIOLATION OF HIS CONSTITUTIONAL RIGHTS

For the first time on appeal, Hicks argues that assuming the district court did not assess the 30-day enhanced penalty the sentence was legal because the fact that a child under the age of 14 was in the car was never proven to the jury beyond a reasonable doubt in violation of *Alleyne v. United States*, 570 U.S. 99, 116, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013) (holding that any facts that increase a mandatory minimum sentence must be submitted to the jury). In other words, the district court could not constitutionally impose an additional 30 days so its failure to do so was not error.

Hicks provides no reason for failing to raise his *Alleyne* claim before the district court even though the issue of whether his sentence was in compliance with K.S.A. 2018 Supp. 8-1567(c) was squarely addressed by the parties in posttrial motions. Instead he argues that we should consider this unpreserved claim because the district court was right for the wrong reason. See *State v. Gutierrez-Fuentes*, 315 Kan. 341, 347, 508 P.3d 378 (2022).

We are very troubled by this argument and the reason it was not raised below is clear. The jury *did* find that a child under the age of 18 was in the car. The jury was instructed as follows:

30

"Instruction 9:  The defendant is charged in Count I with operating a vehicle while under the influence of alcohol. The defendant pleads not guilty. To establish this charge each of the following claims must be proved:

"One, the defendant operated a vehicle.

"Two, the defendant while operating the vehicle was under the influence of alcohol to a degree that rendered him incapable of safely driving a vehicle.

"Three, the defendant was 18 or more years old.

"*Four, the defendant had at least one child in the vehicle who was less than 18 years old.*

"Five, this act occurred on or about the 12th of February, 2022, in Shawnee County, Kansas." (Emphasis added.)

The jury found him guilty of this charge, necessarily finding that the State had met its burden with regards to all elements charged. It also found Hicks guilty of endangering a child. That instruction was as follows:

"Instruction 10:  The defendant is charged in Count II with endangering a child. The defendant pleads not guilty. To establish this charge each of the following claims must be proved:

"One, the defendant knowingly and unreasonably caused or permitted unnamed child to be placed in a situation in which there was a reasonable probability the child's life, body, or health would be in danger.

"Two, the child was less than 18 years old.

"Three, this act occurred on or about the 12th day of February, 2022, in Shawnee County, Kansas."

And the evidence supports the jury's finding. During the video of the stop, which was submitted to the jury, Hicks' passenger is heard informing Trooper Rule that the child in the car was six years old. During the trial, Trooper Rule testified the child was a small prepubescent girl, less than 80 pounds, and less than 10 years old. Hicks' trial counsel cross-examined Trooper Rule about the age of the child. Hicks fails to disclose this in his reply brief and fails to argue that even though the jury was advised it had to

31

find that there was a child in the vehicle with him, somehow *Alleyne* bars the sentence he received. Moreover, we pause to note that the statute in effect at the time Hicks committed this crime, as it does today, requires the child to be under the age of 18, not 14. So we were presented with a second legal error by counsel. Counsel misstated the law and argues a falsehood—that it was never proven to the jury that Hicks' passenger was under the age of "14 [*sic*]" in violation of *Alleyne*.

We decline to consider, for the first time on appeal, an issue that is patently frivolous on its face with no support in the record.

Convictions affirmed, sentence vacated, and case remanded with directions.